LESSEE OF WILLIAM POLLARD'S HEIRS, &c., PLAINTIFFS IN ERROR,
*vs.* GAIUS KIBBE, DEFENDANT IN ERROR.*

Action of ejectment in the state Court of Alabama, for a lot of ground in the city of Mobile.
The plaintiff claimed the title to the lot under an act of Congress, and the decision of the
state Court was against the right and title so set up and claimed. A writ of error was
prosecuted to the Supreme Court of Alabama. It was held that this case was embraced
by the twenty-fifth section of the Judiciary Act of 1789, which gives this Court jurisdic-
tion to revise the judgment of the state Court, in such cases.

The act of Congress under which title was claimed, being a private act, and for the benefit
of the city of Mobile, and certain individuals; it is fair to presume it was passed with
reference to the particular claims of individuals, and the situation of the land embraced
in the law at the time it was passed.

A lot of ground was granted by the Spanish government of Florida, in 1802, to Forbes and
Company, in the city of Mobile, which was afterwards confirmed by the commissioners
of the United States. The lot granted was eighty feet in front, and three hundred and
four feet in depth, bounded on the east by Water street. This, while the Spanish govern-
ment had possession of the territory, was known as "a water lot." In front of the lot was a
lot which, at the time of the grant of the lot to Forbes and Company, was covered by the
water of the bay and river of Mobile, the high tide flowing over it; and it was separated from
Forbes and Company's lot by Water street. It was afterwards, in part, reclaimed by Lewis,
who had no title to it, and who was afterwards driven off by one of the firm of Forbes
and Company. A blacksmith's shop was then put on the lot by him; and Lewis, again,
by proceedings at law, obtained possession of the blacksmith's shop, it not being his
improvement. The improvement was first made in 1823. The Spanish governor, in
1809, after the Louisiana treaty of 1803, and before the territory west of the Perdido was
out of the possession of Spain, granted the lot in front of the lot owned by Forbes and
Company, to William Pollard; but the commissioners of the United States, appointed
after the territory was in the full possession of the United States, refused to confirm the
same, "because of the want of improvement and occupation." In 1824, Congress passed
an act, the second section of which gives to those who have improved them, the lots in
Mobile, known under the Spanish government as "water lots," except when the lot so
improved had been alienated, and except lots of which the Spanish government had made
"new grants," or orders of survey, during the time the Spanish government had "power" to
grant the same; in which case, the lot is to belong to the alienee or the grantee. In
1836, Congress passed an act for the relief of William Pollard's heirs, by which the lot
granted by the Spanish government of 1809, was given to the heirs, saving the rights of
third persons; and a patent for this lot was issued to the heirs of William Pollard, by
the United States, on the 2d of July, 1836. Held, that the lot lying east of the lot
granted in 1802, by the Spanish government, to Forbes and Company, did not pass by
that grant to Forbes and Company; that the act of Congress of 1824, did not vest the
title in the lot east of the lot granted in 1802 in Forbes and Company; and that the
heirs of Pollard, under the second section of the act of 1824, which excepted from
the grant to the city of Mobile, &c., lots held under "new grants" from the Spanish go-
vernment, and under the act of Congress of 1836, were entitled to the lot granted in
1809, by the Spanish governor to William Pollard.

The term "new grants," in its ordinary acceptation, when applied to the same subject or
object, is the opposite of "old." But such cannot be its meaning in the act of Congress
of 1824. The term was doubtless used in relation to the existing condition of the ter-
ritory in which such grants were made. The territory had been ceded to the United
States by the Louisiana treaty; but, in consequence of a dispute with Spain about the
boundary line, had remained in the possession of Spain. During this time, Spain con-
tinued to issue evidences of titles to lands within the territory in dispute. The term

---

* Mr. Chief Justice TANEY was prevented sitting in this case by indisposition.

"new" was very appropriately used as applicable to grants and orders of survey of this description ; as contradistinguished from those issued before the cession.

The time when the Spanish government had the " power" to grant lands in the territory, by every reasonable intendment of the act of Congress of 1824, must have been so designated with reference to the existing state of the territory, as between the United States and Spain ; the right to the territory being in the United States, and the possession in Spain. The language, " during the time at which Spain had the power to grant the same," was, under such circumstances, very appropriately applied to the case. It could with no propriety have been applied to the case, if Spain had full dominion over the territory, by the union of the right and the possession ; and, in this view, it is no forced interpretation of the word " power," to consider it here used as importing an imperfect right, and distinguished from complete lawful authority.

The act of Congress of 25th March, 1812, appointing commissioners to ascertain the titles and claims to lands on the east side of the Mississippi, and west side of the Perdido, and falling within the cession of France, embraced all claims of this description. It extended to all claims, by virtue of any grant, order of survey, or other evidence of claim, whatsoever, derived from the French, British, or Spanish governments ; and the reports of the commissioners show, that evidence of claims of various descriptions, issued by Spanish authority, down to 1810, come under their examination. And the legislation of Congress shows many laws passed confirming incomplete titles, originating after the date of the treaty between France and Spain, at St. Ildefonso. Such claims are certainly not beyond the reach of Congress to confirm; although it may require a special act of Congress for that purpose. Such is the act of Congress of 2d July, 1836, which confirms the title of William Pollard's heirs to the lot which is the subject of this suit.

The judgment of the Supreme Court of the United States, in a case brought by writ of error to a Court of a state, must be confined to the error alleged in the decision of the state Court, upon the construction of the act of Congress, before the State Court.

IN error to the Supreme Court of the state of Alabama.

In the Circuit Court for the county of Mobile, state of Alabama, an action of ejectment for a lot of ground situated in the city of Mobile, was instituted by the plaintiffs in error, and was afterwards removed, by change of venue, to the Circuit Court for the county of Baldwin. It was tried before a jury in that Court, and on the trial, the plaintiffs filed a bill of exceptions to the charge of the Court. A verdict and judgment were given for the defendant. From this judgment of the Circuit Court, the plaintiffs prosecuted a writ of error to the Supreme Court of the state of Alabama ; and the judgment of the Circuit Court, in favour of the defendant, was affirmed by the Supreme Court.

The plaintiffs prosecuted this writ of error to the Supreme Court of the United States, under the twenty-fifth section of the Judiciary Act of 1789.

" The following is the bill of exceptions filed by the plaintiffs, on the trial of the cause in the Circuit Court of the county of Baldwin. On the trial of this cause at the above term, the plaintiffs, to maintain the issue on their part, gave in evidence an instrument signed by Cayetano Perez, written in the Spanish language, a translation of which is hereto annexed, as part of this bill of exceptions, but which instrument was shown to have been reported against, and rejected, by the commissioners appointed by the United States government to investigate and report on such matters, because of the want of improvement and occupancy."

[THE SPANISH GRANT, TRANSLATED.

" Mr. Commandant :

" William Pollard, an inhabitant of the district, before you, with all respect represents : That he has a mill established upon his plantation, and that he often comes to this place with planks and property from it, and that he wishes to have a place propitious or suitable for the landing and safety thereof; and that having found a vacant piece at the river side, between the channel which is called " John Forbes and Company's," and the wharf at this place, he petitions you to grant said lot on the river bank, to give more facility to his trading; a favour he hopes to obtain of you.

" *Mobile, 11th December,* 1809. WILLIAM POLLARD."

*Mobile, 12th December,* 1809.

I grant the petitioner the lot or piece of ground he prays for, on the river bank, provided it be vacant. CAYETANO PEREZ.]

They further gave in evidence, an act of Congress, passed on the 26th day of May, 1824, entitled an act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city. They further gave in evidence an act of Congress, passed July 2d, 1836, entitled an act for the relief of William Pollard's heirs. They then gave in evidence a patent, dated the 14th day of March, 1837, issued in pursuance of said act of Congress of the 2d of July, 1836, which patent embraced the premises in question. The plaintiffs further proved that in the year 1813 or 1814, some wreck and drift wood was removed from the place where the premises in question now are, by the hands of William Pollard, the grantee. The defendant gave in evidence a Spanish grant, dated 9th of June, 1802, to John Forbes and Company, for a lot of ground, for eighty feet front on Royal street, with a depth of three hundred and four feet to the east; and bounded on the south by Government street; which grant was recognised as a perfect title, and so confirmed by act of Congress. Attached to the original grant was a certificate signed by W. Barton, Register, Wm. Barnett, Receiver, P. M.; Attest, John Elliott, Clerk; a copy of which is the following :

[PROCEEDINGS OF THE COMMISSIONERS —

*Land Office, Jackson Court House.*

*Commissioners Report, No.* 2; *Certificate, No.* 3.

In pursuance of the act of Congress, passed on the 3d of March, 1819, entitled "an act for adjusting the claims to land, and establishing land offices in the district east of the island of Orleans," we certify that the claim No. 3, in the report of the commissioners, numbered 2, (claimed by John Forbes and Company, original claimant, Panton Leslie and Company,) is recognised by the said act as valid against any claim on the part of the United States, or right derived

from the United States; the said claim being for eighty feet in front, and three hundred and four in depth, area 24,320 feet, situate in the town of Mobile, and claimed by virtue of Spanish grant executed by J. V. Morales, and dated 9th of June, 1802.

Given under our hands this 8th day of January, 1820.

W. BARTON, *Register.*

WM. BARNETT, *Receiver. P. M.*

Attest, JOHN ELLIOTT, *Clerk.*]

A map, or diagram, indicating the property claimed, as well as that covered by the above grant, with other lots, streets, &c., was submitted to the jury, and is to make a part of the bill of exceptions, by agreement between the counsel of the parties.

According to that map and the proof, the lot sued for is east of Water street, and also immediately in front of the lot conveyed by the above mentioned grant to John Forbes and Company, and only separated from it by Water street. The proof showed that, previous to 1819, then, and until filled up, as after stated, the lot claimed by plaintiffs, was at ordinary high tide, covered with water, and mainly so at all stages of the water; that the ordinary high water flowed from the east to about the middle of what is now Water street, as indicated on the map referred to, between the lot claimed by plaintiffs, and that covered by the grant to John Forbes and Company. It was proved that John Forbes and Company had been in possession of the lot indicated by their deed since the year 1802; and that said lot was known under the Spanish government as a water lot; no lots at that time existing between it and the water.

It was proved that, in the year 1823, no one being then in possession, and the same being under water, Curtis Lewis, without any title, or claim under title, took possession of, and filled up east of Water street, and from it eighty feet east, and thirty-six or forty feet wide, filling up north of Government street, and at the corner of the same, and Water street; that Lewis remained in possession about nine months, when he was ousted in the night by James Innerarity, one of the firm of John Forbes and Company; who caused to be erected a smith shop, and from whom Lewis, sometime after regained possession by legal process, and retained it till he conveyed the same. Proved, that when said Lewis took possession, Water street at that place could be passed by carts, and was common. The defendant connected himself, through conveyances for the premises in controversy, with the said grant to John Forbes and Company, also, with the said Curtis Lewis, also, with the mayor and aldermen of the city of Mobile: from each of which sources his title, if any, was derived by deed.

It was admitted by the parties to the suit, that the premises sued for were between Church street and North Boundary street; this was all the evidence introduced on the trial.

On this evidence, the Court charged the jury, that if the lot conveyed as above, to John Forbes and Company, by the deed afore-

[Lessee of Pollard's Heirs *vs.* Kibbe.]

said, was known as a water lot under the Spanish government, and if the lot claimed by the plaintiffs had been improved at, and previous to the 26th day of May, 1824, and was east of Water street, and immediately in front of the lot so conveyed to John Forbes and Company, then the lot claimed, passed by the act of Congress of the 26th of May, 1824, to those at that time owning and occupying the lot so as above conveyed to John Forbes and Company.

"The Court further charged the jury, it was immaterial who made the improvements on the lot on the east side of Water street, being the one in dispute; that by the said acts of Congress, the proprietor of the lot on the west side of Water street, known as above, was entitled to the lot on the east side of it. To which charges of the Court, the plaintiffs, by their counsel, excepted, and this was signed and sealed as a bill of exceptions."

The case was argued by Mr. Test, and Mr. Webster, for the plaintiffs in error; and by Mr. Key, for the appellee.

For the plaintiff in error it was contended, that the charge in the Circuit Court of Baldwin county, was erroneous; and the judgment of the Superior Court of Alabama should be reversed:

1. Because plaintiff had a good title under his original grant, the confirmation thereof by the act of Congress of the 2d July, 1836, and the patent issued in pursuance thereof.

2. The construction put by the judge who tried the cause, on the act of May 26th, 1824, was not the true construction of that act.

3. The said charge to the jury was not warranted by the evidence set forth in the said bill of exceptions.

The counsel for the plaintiffs in error stated, that the question in the case was, whether the grant to Forbes and Company, dated 9th June, 1802, which had been confirmed by the commissioners of the United States on the 8th of January, 1820, conveyed the lot in front of the lot of Forbes and Company, which is now claimed by Pollard's heirs.

1. The plaintiffs had a good and valid title to this lot. They rely on the provisions of the act of Congress of 1826. They do not claim as riparian proprietors.

Pollard was in possession of the property, as is shown by the act of Congress of 1826; and the patent to him was granted under that law. The patent is the highest evidence of title, and the Court will not look beyond or behind it.

If the original grant by Governor Cayetano ᴧ erez was of no value, yet the act of 1836 gave it life, and made it a legal, valid, and indisputable title, against any equitable title; and the defendants have nothing but an equitable title. Cited, the act of Congress of the session of 1836, 1837.

The defendants claim under an act of Congress granting certain lots to the city of Mobile. 3 Story's Laws U. S. 2071. A proper construction of this law negatives this claim. The law gives a title

[Lessee of Pollard's Heirs *vs.* Kibbe.]

to what is now called "a water lot;" not to what were called "water lots" by the Spanish law.

Under the Spanish laws, grants were extended into the river; and no water lots were granted unless particularly described to be such, and so granted. The defendants exhibited no grant, specially de scribing the lot to be a water lot.

The grant of the lot, by the act of 1836, recognises the lot for which the plaintiffs in error contend, as a lot under a "new grant' of the Spanish government; and the lot is given to the heirs of Pollard, the lessors of the plaintiffs in error. The defendants claim under the act of Congress of 1824; and the act of 1836 is a legislative construction of that act.

The jurisdiction of the Court in this case depends upon the question, whether an act of Congress has been misconstrued by the Supreme Court of Alabama. Has this been so?

It has been said that the original grant by the governor of Florida has been treated with scorn, and is of no value. That grants of this description having been for lands within the territory claimed by the United States, under the cession treaty of Louisiana, have always been disregarded. This is not so. Congress have in more than a thousand instances respected and confirmed such titles.

In regard to the contest between the United States and Spain, under the Louisiana treaty, relative to the lands lying west of the river Perdido, possession of those lands was not obtained until 1823. The condition of a country between the time it has been ceded, and the time when it is taken possession of, is determined by the law of nations. The rule of that law is, that nothing is changed until possession is taken of the country.

It is not admitted that Congress could, before the United States took possession of the country, pass laws abrogating the established laws of Spain. Governments are of all others the parties on which the laws of the country which may have acquired the country by treaty, do not operate before they are in possession.

It has often been decided in this Court, that the government which is in possession of a country may make grants. In the case of The State of Rhode Island *vs.* The State of Connecticut, 12 Peters, 748, the Court say, "When a territory is acquired by cession, or even conquest, the rights of the inhabitants to property are respected and sacred. Grants of land by a government de facto, of parts of a disputed territory in its possession, are valid against the state which had the right. 8 Wheat. 509. 12 Wheat. 535. 6 Peters, 712. 8 Peters, 445. 9 Peters, 139. 10 Peters, 330. 718.

The act of Congress of 1804, speaks of and relates entirely to past cases. See act of 26th March, 1804, sec. 14. It declares the titles referred to in it to have been, and to be, null and void. Land Laws, 500.

There is no objection to the title of the plaintiffs in error, on the ground that it was not confirmed by the commissioners of the United

States. Their decision does not disaffirm the title. After the refusal of the commissioners to allow it, an action may be brought upon it.

Was the grant refused by the commissioners because of the provisions of the treaty for the cession of Louisiana? The commissioners say it was refused "because of the want of proof of cultivation and occupation." Grants made after the treaty have been confirmed in many cases: among them a grant to Forbes and Company.

There was a title in the heirs of Pollard under the grant, but the Supreme Court of Alabama decided upon the act of Congress of 1824. The grants made after the treaty have been so often confirmed, that the circumstance shows what was meant in the act of Congress under which the plaintiff in error claims, by "new grants." "New grants" referred to the period of the treaty. The treaty was an epoch from which grants were characterized as new grants.

The grant to Forbes and Company, under which the claim of the plaintiffs in error is opposed, is for three hundred and four feet. It is nowhere said to go to the river. Thus, if a riparian right is claimed, at the common law, it is negatived by the description of the lot. The grantees are limited to the feet and inches stated in the grant, and have no claim to say the grant extends to high water mark.

The act of Congress of 1824, shows that the grants by the Spanish government did not give riparian rights. If the grantees had such rights, why apply to Congress to allow them? The plaintiffs in error had an equitable title before 1824, which should have been protected. The subsequent act gave them a legal title.

The Courts of Alabama have misconstrued the acts of Congress. A construction has been given to the act of 1824, which rides over the title of the lessors of the plaintiffs in error; and this Court only can correct the judgment of the state Court. By the act of 1824, all the lots which belonged to no one, were given to the city of Mobile; but the first section of the act takes no title, equitable or legal, from any one.

The construction of the second section of the act of 1824, which is claimed for the defendant, is such as will take away the property of another person. That construction is: If you find an improved lot, give it to the person who has an improved lot above it: thus giving the lot to one who had no agency in the improvement. This is against the grammatical construction of the law, and against the just intentions of the national legislature. This will not be sustained by the Court, unless they will allow one person to take the property of another without compensation, and that the fair grammatical construction of the law shall be disregarded. The object of the law of 1824 was to give lots not granted by the Spanish government, after the Louisiana treaty; styling such concessions "new grants" to the persons mentioned in the acts. "New grants" were excepted, and were left to the legislation of Congress.

Mr. Key, for the defendants.

The case presents but few points for the consideration of the Court. It is admitted on the part of the plaintiffs in error, that in 1824 the legal title to the lot in controversy was in the United States. If this was so, by the act of Congress of 1824 it became vested in the defendants. Before 1824, the defendants had an equitable title, which was made a perfect legal title by that act.

By the decisions of this Court, in Foster and Elam *vs.* Neilson, 2 Peters, 253; and Garcia *vs.* Lee, 12 Peters, 511, Spanish grants, made for any part of the territory west of the Perdido, after the treaty of 1803 with France, by which Louisiana was ceded to the United States, are declared void. No equitable title under the Spanish grant, made after 1803, could exist against the United States.

The whole question between the parties in this case depends on the act of Congress of 1824. It is to be admitted, that if this act is applicable to the title of the plaintiffs, the title is complete. If the title they claim is within the exception in that act, why ask or take a title under the act of 1836?

The title of the defendants is under a Spanish grant of 1802, which has been confirmed by the United States. The grant was for ground to which the lot claimed by the plaintiffs in error was an accretion. After the treaty of 1803, the riparian rights by the common law, gave the right to this lot to Forbes and Company. Whatever was the Spanish law before the treaty, afterwards, the common law prevailed.

A just construction of this act of Congress of 1824, gives the lot to the defendants; and the judgment of the Supreme Court of Alabama should be sustained by this Court.

Mr. Justice THOMPSON delivered the opinion of the Court.

The writ of error in this case brings up the record of the final judgment of the Supreme Court of the state of Alabama. This case is brought here under the 25th section of the Judiciary Act of 1789; that Court being the highest Court of law in that state in which a decision could be had. It was an action of ejectment, brought to recover possession of a lot of land in the city of Mobile. Upon the trial of the cause, the plaintiff claimed title to the premises in question under an act of Congress, and the decision in the state Court was against the right and title so set up and claimed. It is, therefore, one of the cases embraced in this section of the Judiciary Act, which gives to this Court jurisdiction to revise the judgment of the state Court.

The act under which title was claimed, was passed on the 26th of May, 1824, (Land Laws, 885,) granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of that city. Although the judgment of this Court must be confined to the error alleged in the decision of the state Court, upon the con-

[Lessee of Pollard's Heirs *vs.* Kibbe.]

struction of the act of Congress under which title was claimed, it becomes necessary, to the right understanding of the act which was drawn in question, to look at the state of facts appearing on the record. It being a private act, for the benefit of the city of Mobile and certain individuals, it is fair to presume it was passed with reference to the particular claims of such individuals, and the situation of the land embraced within the law at the time it was passed.

These facts, as they appear on the record, are briefly as follow. On the trial, the plaintiff gave in evidence an instrument signed by Cayetano Perez, dated at Mobile, the 12th day of December, in the year 1809, purporting to be a petition of William Pollard, for a certain lot of ground, which is described as vacant, at the river side, between the canal, which is called John Forbes and Company's, and the wharf of this place, corresponding in description with the location of the lot in question; and a grant accompanying the petition, in these words : "I grant the petitioner the lot or piece of ground he prays for, on the river bank, provided it be vacant:" which grant was rejected by the commissioners appointed by the government of the United States, to investigate and report upon such claims, because of the want of improvement and occupation of the lot. The defendant gave in evidence a Spanish grant, dated the 9th of June, in the year 1802, to John Forbes and Company, for a lot of ground eighty feet front on Royal street, with a depth of three hundred and four feet to the east, and bounded on the south by Government street; which grant was recognised by the commissioners as a perfect title, and so confirmed by Congress. A map or diagram is referred to in the record, by which it appears that the lot sued for is east of Water street, and immediately in front of the lot conveyed by the above mentioned grant to John Forbes and Company, and only separated from it by Water street. It appeared in evidence, that previous to the year 1819, and until filled up by Curtis Lewis, the lot in question was, at ordinary high tide, covered with water, and mainly so at all stages of the tide. That the ordinary high water flowed from the east, to about the middle of what is now Water street. It was proved that John Forbes and Company had been in possession of the lot granted to them since the year 1802; and that said lot was known under the Spanish government, as a water lot; no lots at that time existing between it and the water.

In the year 1823, no one being in possession of the lot in question, and the same being under water, Curtis Lewis, without title, or claim under title, took possession of and filled up east of Water street, about thirty-six or forty feet wide, and eighty feet deep from Water street; the filling up being north of Government street, at the corner of that and Water street. Lewis remained in possession about nine months, when he was ousted in the night time by James Innerarity, one of the firm of John Forbes and Company; who caused to be erected thereon a smith's shop. Lewis, some time after, regained the possession by legal process, and retained it until he conveyed away the same. When Lewis took possession, Water

street, at that place, could be passed by carts, and was common. The defendant connected himself through conveyances for the premises in question, with the grant to John Forbes and Company, and also with Curtis Lewis, and the mayor and aldermen of the city of Mobile.

Such being the situation of the lot in question, and of the several claims to the same, the act of the 26th of May, 1824, was passed. The first section of this act can have no bearing upon the claim set up to the lot in question. It only vests in the city of Mobile all the right and claim of the United States to all the lots not sold or confirmed to individuals, either by this or any former act, and to which no equitable title exists in favour of any individual, under this or any other act. If, therefore, the second section applies to the lot in question at all, it is excepted out of the first section. That the second section does apply to this lot, has not been and cannot be doubted. That section is as follows: " That all the right and claim of the United States to so many of the lots of ground east of Water street, and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river and the front of the lots known under the Spanish government as water lots, in the said city of Mobile, whereon improvements have been made, be, and the same are hereby, vested in the several proprietors and occupants of each of the lots heretofore fronting on the river Mobile; except in cases where such proprietor or occupant has alienated his right to any such lot, now designated as a water lot, or the Spanish government has made a new grant or order of survey for the same, during the time at which they had the power to grant the same, in which case, the right and claim of the United States shall be, and is hereby, vested in the person to whom such alienation, grant, or order of survey was made, or in his legal representatives. Provided, that nothing in this act contained, shall be construed to affect the claim or claims, if any such there be, of any individual or individuals, or of any body politic or corporate."

There are two facts to be collected from this description of the lots embraced in this section of the act, which must be kept in view in deciding this question, viz. that the lots on the west side of Water street were known under the Spanish government as water lots; and that the lots on the east side of Water street, are now known as water lots, and may properly be distinguished under the denomina tion of old water lots, and new water lots.

The only question for this Court to decide is, whether the state Court misconstrued this act, by deciding against the right and title set up under it by Pollard's heirs. The record states, that the Court charged the jury, that if the lot conveyed as above to John Forbes and Company, by the deed aforesaid, was known as a water lot under the Spanish government, and if the lot claimed by the plaintiffs, had been improved at and previous to the 26th day of May, 1824, (the date of the law,) and was east of Water street, and imme diately in front of the lot so conveyed to John Forbes and Company,

then the lot claimed passed by the act of Congress of the 26th of May, 1824, to those at that time owning and occupying the lot so as above conveyed to John Forbes and Company.

The facts hypothetically put by the Court to the jury had been fully proved in the affirmative; and indeed were not at all denied; to wit, that the lot conveyed to John Forbes and Company was known under the Spanish government as a water lot; and that the lot claimed by the plaintiffs had been improved previous to the 26th of May, 1824, and was in front of the lot conveyed to John Forbes and Company.

The construction therefore of the Court was, substantially, that the act conveyed the lot in question to the owners and occupants of the lot conveyed to John Forbes and Company. That such was the construction of the act given by the Court, is conclusively shown by the subsequent part of the charge: that it was immaterial who made the improvements on the lot in dispute on the east side of Water street. That by the said act of Congress, the proprietor of the lot on the west side of Water street, was entitled to the lot on the east side of it.

If this construction of the act was erroneous, and against the right claimed by the plaintiffs, the judgment must be reversed. The act is, undoubtedly, very obscurely worded, and its construction, it must be admitted, is doubtful.

The principal difficulty arises upon the true understanding and reference of the words, "whereon improvements have been made:" whether they refer to improvements on the lot on the west side of Water street, or on the lot in question on the east side of Water street. The grammatical construction would undoubtedly refer the improvements to the lot on the west side of the street, and would be carrying into effect what is believed to be the general course of policy in most of the United States, of giving a preference to the owner of land on the shore of navigable streams of water, to the right and privilege of the land under the water between high and low water mark. And on the other hand, it would seem unjust, where actual improvements had been made on the land below high water mark, to disregard and take away such improvements, and give them to the owner of the lot on the west side of the street.

The evidence as to the extent and value of the improvements on the lot in question is very loose, and affords but little information upon that point. They could probably have been but of little value. They were made by Curtis Lewis, he not having any title, or even claim of title. And it is not reasonable to suppose, that under such circumstances, and from the short time he was in possession before the passage of this act, that he would have made very valuable improvements. And if the intention of Congress had been to give the lots on the east side of Water street to those who had improved them, it would have required but a very plain and simple declaration to that effect; and might have been just and equitable, if such improvements were valuable. But it is difficult to conceive how

the phraseology in the act could have been adopted to indicate such intention.

It is not, however, necessary to decide upon the construction of this act, as between the conflicting claims of the owner of the lot on the west side of Water street, and those who had made improvements on the lot on the east side of that street. For there is excepted out of the act, all cases where the Spanish government has made "a new grant," or order of survey for the same, during the time at which they had "the power" to grant the same: in which cases the right and claim of the United States are vested in the person to whom such grant or order of survey was made, or his legal representatives. And if the plaintiffs bring themselves within this exception, the right is secured to them. And this presents the question as to the construction to be given to this exception.

Two points of inquiry seem to be presented : one relates to the description of the grant or order of survey therein mentioned; and the other as to the time when made. The exception describes these grants or orders of survey as "new grants" or orders of survey. The term "new," in its ordinary acceptation when applied to the same subject or object, is the opposite of old. But such cannot be its meaning as here used: for there is no pretence that two grants or orders of survey, had at any time been issued for the same lot. Some other meaning must, therefore, be given to it. And it, doubtless, was used in relation to the existing condition of that part of the territory, when grants or orders of survey like the one in question were made. The territory had been ceded to the United States by the Louisiana treaty: but in consequence of some dispute with Spain respecting the boundary line, this part of the territory remained in the possession of Spain. And it is a fact, established by the public documents, and laws of Congress, and cases which have come before this Court, that during the period between the cession by France, and the acquiring possession by the United States, Spain continued to issue evidences of title of various descriptions ; some complete grants, and others, which were only inchoate rights or concessions. And the term "new" was very appropriately used as applicable to grants and orders of survey of this description, as contradistinguished from those issued before the cession. And this construction is rendered certain, when the description of the grants is connected with the subsequent part of the sentence as to the time when made, to wit, during the time at which the Spanish government had "the power" to grant the same. This time, according to every reasonable intendment, must have been so designated with reference to the existing state of the territory as between the United States and Spain: the right to the territory being in the United States, and the possession in Spain. The language, "during the time at which Spain had the power to grant the same," was, under such circumstances, very appropriately applied to the case. It could with no propriety have been applied to the case, if Spain had full dominion over the territory, by the union of right and posses-

sion; and in this view it is no forced interpretation of the word power, to consider it here used, as importing an imperfect right, and distinguishable from complete lawful authority. And indeed no other sensible construction can be given to the language here used : and the course of the government of the United States, with respect to the claims originating during this period would seem necessarily to call for this construction. The act of Congress of the 25th of April, 1812, appointing commissioners to ascertain the titles and claims to lands on the east side of the river Mississippi, and west of the river Perdido, and falling within the cession by France; embraced all claims of this description; it extended to all claims by virtue of any grant, order of survey, or other evidence of claim whatsoever, derived from the French, British, or Spanish governments. And the reports of the commissioners show that evidence of claims of various descriptions, issued by Spanish authority down to the year 1810, came under the examination of the commissioners: and the legislation of Congress shows many laws passed confirming incomplete titles, originating after the date of the treaty between France and Spain, at St. Ildefonso.

Such claims are certainly not beyond the reach of Congress to confirm, although it may require a special act of Congress for that purpose; and the present claim being founded upon such act, distinguishes it from the doctrine of this Court in the cases of Foster and Elam *vs*. Neilson, 2 Peters, 253; and Garcia *vs*. Lee, 12 Peters, 511. And such claims have been recognised by this Court as existing claims, and not treated as being absolutely void. In the case of Delacroix *vs*. Chamberlain, 12 Wheat. 599, an order of survey issued during this period, came under the consideration of the Court. It bore date in the year 1806. The Court said, this order of survey was not sufficient to support an action of ejectment not having been recorded or passed upon by the board of commissioners so as to vest a legal title. But the Court observed, that this order of survey bears date at a time when the Spanish authorities were in the actual possession of Mobile, where the land lies, and it was claimed as a part of the Floridas, then belonging to the Spanish crown; and the United States claimed it as a part of Louisiana. That the United States, having since purchased the Floridas, without having previously settled the controverted boundary, rendered it unnecessary to examine these conflicting claims. And the Court add, if the United States and Spain had settled this dispute by treaty, before they extinguished the claim of Spain to the Floridas, the boundary fixed by such treaty would have bound all parties. But as that was not done, the United States have never, so far as we can discover, distinguished between the concessions of land made by the Spanish authorities within the disputed territory, while Spain was in the actual possession of it, from concessions of a similar character made by Spain, within the acknowledged limits. We will not, therefore, raise any question upon the ground of want of authority in the intendant to make such concession. Nothing more

is to be understood from this case, than that the Court did not consider the circumstance that the concession being made whilst Spain was in the actual possession of the territory, had prevented Congress from acting on the subject of such concessions And when Congress, in the act of 26th of May, 1824, excepts certain grants or orders of survey, made by Spain during the time at which they had the power to grant the same: the conclusion is irresistible, that it included grants like the one to William Pollard, now in question. This grant bears date on the 9th day of December, in the year 1809, and was rejected by the commissioners for want of improvement and occupation; and not because it was absolutely void. But suppose it had been void under the then existing laws in relation to these lands, it could not prevent Congress from afterwards confirming this grant. The act of the 26th of March, 1804, (2 Story, 939, sec. 14,) declaring certain grants void; could not affect the one to Pollard, which was made in the year 1809, after the passage of that law.

But if the construction of the act of the 26th of May, 1824, is doubtful, as it is admitted to be, the act of the 2d July, 1836, is entitled to great weight in aiding to remove that doubt. It is an act specially for the relief of William Pollard's heirs. It declares, that there shall be, and hereby is, confirmed unto the heirs of William Pollard, deceased, a certain lot of ground, situated in the city of Mobile, and bounded as follows, to wit: On the north by what was formerly known as John Forbes and Company's canal; on the west by Water street, on the south by the King's wharf, and on the east by the channel of the river; being the description of the lot now in question; and directing a patent to be issued in the usual form for the same. There is a proviso, declaring that this act shall not interfere with or affect the claims of third persons. But giving to this proviso its full force and effect, the enacting clause is a legislative construction of the act of 1824, and locates the patent thereby directed to be issued upon the lot now in question. They are acts in pari materia, and are to be construed together; and in such a manner, if the language will reasonably admit of it, as to permit both acts to stand together and remain in full force. It is not to be presumed, that Congress would grant or even simply release the right of the United States to land confessedly before granted. This would be only holding out inducements to litigation. And these two acts cannot stand together without considering the lot in question as coming within the exception of the act of 1824; and the act of 1836, as a confirmation, (as it purports to be,) of the title to the heirs of William Pollard.

The judgment of the Supreme Court of the state of Alabama is, accordingly, reversed.

Mr. Justice M'LEAN.

I agree to the judgment of reversal in this case; and as my opinion is mainly founded on the construction of the second section of the

act of 1824, without reference to the exceptions it contains, I will state, in a very few words, my views in regard to that section.

It declares " that all the right and claim of the United States to so many of the lots of ground east of Water street, and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river and the front of the lots known under the Spanish government as water lots, in the said city of Mobile, whereon improvements have been made, be, and the same are hereby vested in the several proprietors and occupants of each of the lots heretofore fronting on the river Mobile; except in cases where such proprietor or occupant has alienated his right to any such lot, now designated as a water lot, or the Spanish government has made a new grant," &c.

The lots first named in this section are those to which the right of the United States is relinquished; and those lots are now denominated water lots, in contradistinction to those called water lots under the Spanish government.

" All the right and claim of the United States is relinquished to so many of the lots of ground"—then follows a description of the locality of these lots, lying "east of Water street, and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river and the front of the lots known under the Spanish government as water lots, in the said city of Mobile:" and here the description of the locality of these lots ends, and the words "whereon improvements have been made," follow. Now I entertain no doubt the improvements must be made on the lots first named, and to which the United States relinquish their right; and not on those lots named merely to show the local situation of the present water lots. And this is the construction given to the section by the Supreme Court of Alabama.

The improvements then must be made on the water lot; and the lot in controversy, in this case, is a water lot.

The Court instructed the jury that "if the lot claimed by the plaintiffs had been improved at and previous to the 26th May, 1824, and was east of Water street, and immediately in front of the lot so conveyed to John Forbes and Company, then the lot claimed, passed by the act of Congress, to those at that time owning and occupying the lot so as above conveyed to John Forbes and Company; and that it was immaterial who made the improvements on the disputed lot."

The second section gives to the proprietor of the lot fronting the water lot, such water lot, provided it has been improved.

Now two things must concur to give a title under this act; and these are, proprietorship of the front lot, and improvements on the water lot. But, by whom must these improvements be made or owned, at the passage of the law?

The act does not specify; and the Court instructed the jury that if improvements were made, it was not material by whom they were made. Can this be the true construction of the act?

Congress did not intend to give to the proprietor of the front lot

the water lot, unless it was improved; nor did they intend to give to the person who had improved the water lot, such lot, unless he was the proprietor of the front lot. The improvements of the water lot were as essential to the claim of title under this act, as the proprietorship of the front lot. And can it be supposed that Congress intended to give the water lot to the proprietor of the front lot, for the reason that the water lot had been improved by a stranger? In other words, that Congress, by a solemn act of legislation, would give a lot of ground to one man, because it had been improved by another? This is the principle asserted by this construction; and it is so unjust, and so directly opposed to the legislation of Congress, in regard to the pre-emptive rights, on the ground of improvements, that I am unwilling to sanction it. There is no instance in the entire history of legislation by Congress, where they have sanctioned such a principle. The policy has been to secure to the individual the benefits of his own labour and expenditure. And I am of the opinion that unless the proprietor of the front lot was, on the 26th May, 1824, also the proprietor of the improvements on the water lot, he can claim no title under the act.

Mr. Justice BALDWIN.

I fully concur with the Court on all the points embraced in their opinions, as well as the reasons assigned; being fully satisfied with the construction given to the acts of Congress of 1804, 1824, and 1836, I have no desire to add any thing to the conclusive views presented in the opinion. But there are other important considerations necessarily connected with the merits of the case, which induce me to notice them in a separate opinion, leading to the same conclusion on other grounds.

As it has been my assigned duty on several occasions to examine the subject of claims and titles to land, in the various territories which the United States acquired by cession from Georgia, France, and Spain; a broad and varied field of investigation has been opened, on a part of which there has been no opinion of this Court as yet delivered. That part is a review of the political condition of the territory between the Perdido and Mississippi, from 1800 to 1821, under the Louisiana treaty, the various acts of the executive and legislative departments of this government, in relation to its cession, occupation, government, and adjustment of claims therein, the constitution, and laws of nations; before the ratification of the treaty of 1819, and in connexion with that treaty; the judicial exposition of both treaties by this Court. It is a subject of high concern to numerous claimants of land within that territory; to the United States, both in interest and in relation to the formal complaints made by Spain of the omission " to cause the grants of the king to be respected, according to the stipulation of the eighth article of the treaty of 1819." This complaint was made soon after the decision of the case of Foster and Elam vs. Neilson, in 1829; and in 1832 the Secretary of State, after the decision of the case of

Arredondo, made to the House of Representatives a long and full report in relation to these grants; in which he states the opinion of the executive department to be most decidedly in favour of their confirmation, on every ground on which they could be considered; and especially on the faith and honour of the United States pledged in the treaty. He felt himself to be unable to answer what he declared to be the just demands and complaints of Spain, and assigned as the sole reason why the executive had not recommended an immediate confirmation of the grants by Congress, the two decisions of this Court in those two cases.

Under such circumstances, I take this occasion to throw this responsibility from the Court, in the course now pursued, and hope to show most clearly that those decisions have hitherto been much misapprehended; and when taken in connexion with subsequent ones, they most conclusively establish the right of the grantees of Spain in the disputed territory, derived from grants made between 1803 and 1810, while Spain was in the undisputed possession west of the Perdido, independently of the treaty of 1819, a fortiori by its stipulations. In so doing I admit in the fullest manner, for all the purposes of this case, and the principles it involves, that this Court is bound to take the east boundary of Louisiana to be the Perdido; that it was a political question, which having been settled by the political departments of the government, cannot be questioned in this; and that, as held in Foster and Elam, 2 Peters, 309, no title can be maintained under a Spanish grant; "singly" on the ground that the Spanish construction of the treaty of 1803 was right, and the American construction wrong.

Keeping this principle in view, I shall consider the title of the plaintiff under a Spanish concession, made in 1809, by the lawful authority of the king, independent of its confirmation by any special act of Congress; as resting on its validity by the laws of nations, the Constitution of the United States, the ordinance of 1787, the two treaties, and the general course of legislation by Congress, in relation to government and property in the disputed territory. It will be observed, that the claim of the plaintiff was duly filed and recorded, pursuant to the acts of Congress for adjusting claims to land west of the Perdido; he is, therefore, not deprived of any benefit which they confer or rights which are reserved; but may rely on any support they may give to his title, by his having complied with all the requisitions enjoined. On a subject so broad, so interesting, so vitally affecting the rights of private property, under cessions by foreign powers, or the states of this Union to the United States; the course of argument or opinion has hitherto been too limited on the course of the political departments of the government, to save the necessity of the course herein pursued. It has been rather assumed, than deduced from that detailed investigation which can alone lead to a satisfactory result, on matters so complicated and interwoven into our system of territorial, state, and federal governments.

47

In 1800, Spain ceded Louisiana to France, by the treaty of St. Ildefonso, but retained peaceable possession till May 1803, when it was surrendered to France in the same manner in which it was ceded by the previous treaty, declaring that, "the limits of both shores of the Mississippi shall remain forever fixed by the treaty of Paris, in 1763; and consequently, the settlements from the river Manshack or Iberville, to the line which divides the American territory from the dominions of the king, shall remain in the possession of Spain, and annexed to West Florida." Vide 2 Peters, 303. White's Comp. 164.

In October, 1803, Congress authorized the President to take possession of and occupy the territory ceded by France to the United States, and to organize a temporary government, "for maintaining and protecting the inhabitants of Louisiana, in the free enjoyment of their liberty, property, and religion." 2 Story, 907.

In December following, France surrendered the province to the United States, as it was ceded by Spain to France, under the same clauses and conditions, &c.; and as this Court have declared, "in every respect with all its rights and appurtenances, as it was held by France, and received by France from Spain." 10 Peters, 732.

Spain then was in the possession of the disputed territory, by the consent of France, expressed in the surrender of Louisiana; and the acceptance of the surrender by France to the United States, as she received it from Spain, was equally a consent by the United States to the continuance of the possession of Spain. Though the United States soon asserted her right to the "sovereignty and propriety" over and in the territory as far east as the Perdido, no attempt was made to disturb the possession of Spain till 1810. From 1803 till October, 1810, the condition of the country was this: Spain was the acknowledged sovereign de facto, in the peaceable exercise of all the powers of government, and claiming to be also the sovereign de jure; the United States neither asserting nor exercising the powers of a government de facto, but asserting her right as sovereign de jure under the treaty of 1803; and as this Court said, "No practical application of the laws of the United States to this part of the territory was attempted, nor could be made while the country remained in the actual possession of a foreign power." 2 Peters, 304.

In October, 1810, the President, by his proclamation, ordered military possession to be taken of the disputed territory; declared the laws of the United States to be in force within it; and ordered the inhabitants to be obedient thereto; but it was also declared, that in the hands of the United States, the territory was "still left a subject of fair and friendly negotiation and adjustment," &c. And, "under the full assurance that the inhabitants shall be protected in the enjoyment of their liberty, property, and religion." Vide 3 State Papers, Foreign Relations, 397, 398. Proclamation at large. At this time there was a revolutionary convention in session at Baton Rouge, within the disputed territory, claiming to be an independent

government, to be admitted into the Union.; and also claiming the "unlocated lands" therein. Ibid. 395, 396.

In replying to these propositions, the Secretary of State, in November, 1810, in asserting the right of the United States as far as the Perdido, by the treaty of 1803, says: "The delivery of possession has, indeed, been deferred, and the procrastination has been heretofore acquiesced in by this government, from a hope patiently indulged, that amicable negotiation would accomplish the purpose of the United States," &c. The Secretary then makes these remarks: "The vacant land of this territory, thrown into common stock with all the other vacant land of the Union, will be a property in common for the national uses of all the people of the United States. The community of interest upon which this government invariably acts, the liberal policy which it has uniformly displayed towards the people of the territories, (a part of which policy has ever been a just regard to honest settlers,) will, nevertheless, be a sufficient pledge to the inhabitants of West Florida, for the early and continued attention of the federal legislature to their situation and their wants." Ibid. 398.

In enclosing the President's proclamation to the governor of Mississippi, the Secretary of State directs him to do whatever his powers will warrant, to "secure to the inhabitants the peaceable enjoyment of their liberty, property, and religion; and to place them as far as may be, on the same footing with the inhabitants of the other districts under his authority." Ibid. 396, 397.

In January, 1811, the President recommended to Congress, in a confidential message, the expediency of authorizing him "to take temporary possession of any part of Florida, in pursuance of arrangements with the Spanish authorities, and for making provision for the go crnment of the same during such possession." 3 State Papers, Foreign Affairs, 394, 395. A law was accordingly passed, giving the authority required as to the territory east of the Perdido, and south of Georgia and the Mississippi territory, and for organizing a government for the protection and maintenance of the inhabitants of the said territory, in the full enjoyment of their liberty, property, and religion. At the same time, Congress resolved under certain contingencies, on the "temporary occupation of the territory adjoining the south border of the United States; they at the same time declare, that the said territory shall in their hands remain subject to future negotiation." 6 Laws, 592, 593.

In February, 1813, the President was authorized "to occupy and hold all that tract of country called West Florida, which lies west of the Perdido, not now in the possession of the United States;" for which purpose, and "for affording protection to the inhabitants, under the authority of the United States; the President was authorized to employ the military and naval force of the United States." 6 Laws of the United States, 593. This resolution and law remained unpublished till 1821, after the final ratification of the

treaty of 1819; but under them the whole disputed territory was taken and held by the United States, till it was annexed to the adjacent states by acts of Congress.

In 1812, that portion which was situated between the Iberville, the Mississippi, the east branch of Pearl river, and the Mississippi territory, was annexed to Louisiana on condition that a law should be passed " securing to the people of the said territory, equal rights, privileges, benefits, and advantages, with those enjoyed by the people of the other parts of the state." Vide, 2 Story, 1224. 1230. A law was passed by Louisiana, in compliance with this condition. In May of the same year, that portion which was situated between the east boundary of Louisiana and the Perdido, was annexed to the Mississippi territory, to be governed "by the laws now in force, or which may be hereafter enacted, and the laws and ordinances of the United States relative thereto, as if the same had originally formed a part thereof," &c., 2 Story, 1248; by subsequent acts, this part of the territory was divided between Mississippi and Alabama, and thence formed a part of those states, the former of which was admitted into the Union before the signature of the treaty of 1819, and the latter in December following. Vide, 3 Story, 1617. 1620. 1635. 1735. 1804. 2 Peters, 308.

From this summary view of the course of the executive and legislative branches of the government, it is apparent, that they were in the assertion of the territorial rights of the United States, as claimed by them under the treaty of 1803; it is also apparent from the solemn pledges made by both departments, that the possession of the country was taken and held by force, yet subject to future negotiation as to the right of sovereignty and propriety, and full assurances to the inhabitants of being maintained and protected in the free enjoyment of their property.

Before proceeding to the stipulations of either treaty, it is now necessary to notice those acts of Congress which are referred to in the President's proclamation of 1810, in which he declares, " That the acts of Congress relating to this territory, though contemplating a present possession by a foreign authority, have contemplated, also, an eventual possession of the said territory by the United States, and are accordingly so framed as to extend their operation to the same." 3 State Papers, For. Aff. 397.

The principles of this proclamation were adopted by Congress, whereby the laws which bound the inhabitants of the disputed territory, at the same time protected them in their rights of property, as completely as in the island of Orleans, or west of the Mississippi; these laws were suspended in their operation during the occupation of Spain, but applied to the whole country ceded by France to the United States, as soon as it came into their possession, and their provisions, from the first to the last, are of a uniform character. Whenever Congress gave authority to take possession of the ceded territory, and provide for its temporary government, the declared

object was, "to maintain and protect the inhabitants in the enjoyment of their property," &c., as has been seen in the act of 1803. 2 Story, 907.

By the act of 1804 it was provided, that "no law shall be valid which is inconsistent with the laws and Constitution of the United States." 2 Story, 933. "The laws in force in the said territory, and not inconsistent with this act, shall continue in force until altered, modified, or repealed." 2 Story, 937.

The act of 1805 authorized a government similar to that of the Mississippi territory, and declared the ordinance of 1787 in force, (except as to the descent of estates, and slavery;) and continued the existing laws till altered, &c.; it also authorized the admission of the territory into the Union, according to the third article of the treaty of 1803. 2 Story, 963, 964.

As this act placed the whole ceded territory under the same system of government as Mississippi, we must look to the acts of 1798 and 1800, which organized a government over that territory, (before any cession was made by Georgia to the United States,) without the consent of Georgia, and while the whole territory over which the United States thus assumed jurisdiction, was claimed by Georgia. This is necessary, in order to ascertain what effect the United States intended that their occupation of the territory then in controversy should have upon the rights of Georgia, or of the proprietors of lands claiming under that state. This is the more important, when the compact with Georgia, in 1802, is applied to the pre-existing state of things in the territory in dispute between her and the United States; for it will be found in all respects analogous to the state of things existing in the country west of the Perdido, before the treaty of 1819 took effect; and that the proclamation of the President, and the acts of Congress, for taking the possession of West Florida, and annexing it to the contiguous territories first, and then to the states, contain pledges fully as strong, and to the same import, as those given to Georgia by this provision of the acts of 1798 and 1800: "That the establishment of the said government shall in no respect impair the right of the state of Georgia, or of any person or persons, either to the jurisdiction or the soil of the said territory; but the rights and claims of the said state, and of all persons interested, are hereby declared to be as firm and available as if this act had never been made." 1 Story, 495. 778.

In connection with this provision, it must be observed, that up to 1797, Spain had claimed and occupied the southern portion of the Mississippi territory as part of Florida; pursuant to the treaty of 1795, she surrendered all the country north of the 31° north latitude to the United States. The words, "any" and "all persons," extend, therefore, as well to those who claimed lands north of that line under Spain, as those who claimed under Georgia; and as Spain had relinquished her rights to the territory, those of Georgia alone were noticed, while the granters of either stood on the same precise footing under these laws. But the treaty of 1795, between

the United States and Spain, gave those claiming under her this protection. "It is also agreed, that the inhabitants of the territory of each party, shall respectively have free access to the Courts of justice of the other; and they shall be permitted to prosecute suits for the recovery of their property, &c.; and the proceedings and sentences of the said Courts, shall be the same as if the contending parties had been citizens or subjects of the said (same) country." Art. 20, 1 Laws U. S. 276.

This analogy between the condition of the territory south of the 31° north latitude, and west of the Perdido, and that which lies north thereof, has been made the more applicable by the act of 1812, which, it has been seen, applies the laws and ordinances of the United States, and the laws then in force, to the territory west of the Perdido, precisely as " if it had formed originally a part of the Mississippi territory." 2 Story, 1248. And as the act of 1805 put the territorial government of Louisiana and Mississippi on the same footing, all the laws applicable to the one must be applied to the other and every part of it, whenever the United States assumed the powers of government. The act of 1805 adopted the ordinance of 1787, enacted for the government of the territory north and west of the Ohio in general terms; the act of 1798 is more explicit in declaring, " That from the establishment of the said government, the people of the aforesaid territory shall be entitled to and enjoy all and singular the rights, privileges, and advantages granted " by that ordinance," in as full and ample manner as they are enjoyed " by them." 1 Story, 495.

Among these rights, &c., are that of trial by jury, the writ of habeas corpus, judicial proceedings according to the course of the common law, the protection of property, the inviolability of contracts, and the right of admission into the Union, on an equal footing with the original states. 1 Laws U. S. 479. In addition to which, the third article of the Louisiana treaty stipulates, that " the inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States; and, in the meantime, they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion they profess."

This, then, was the condition of the disputed territory and its inhabitants, from the time the United States took possession and governed it as a part of their territory. The right of sovereignty and general propriety remained subject to pending negotiation; the civil rights of the people, and their rights of property were protected by various acts of Congress: the ordinance of 1787, the treaty of 1803, and the Constitution of the United States. The local laws remained in force till altered, and the political rights of the people were such as existed in all the other territories. 1 Peters, 542. When these territories became states, the inhabitants thereof became

citizens of those states, and, as such, entitled to all the rights which citizens enjoyed in other states; and the subjects of Spain, who owned or claimed property, had, by the twentieth article of the treaty of 1795, the same right of suing for its recovery in the Courts of the United States, as one of its citizens had. 9 Peters, 234.

On this state of things, the treaty of 1819 had no influence; at the time of its ratification, the whole disputed territory was annexed to the contiguous states; the inhabitants were incorporated in the Union, and were citizens of the United States; and the respective states, in virtue of what this Court most truly denominate acts of "sovereign power," exercised by them under the treaty of 1803, over a part of what the United States insisted and Spain denied, was a part of Louisiana; claiming only to stand in the place of the king, and, during negotiation, to exercise the powers and rights which he had exercised till 1810; the United States had never attempted by law to impair any right of private property, or to insert such stipulation into the treaty of 1819, (2 White's Rec. 498,) but expressly disclaimed such intention, and admitted the validity of all fair grants. 2 White's Rec. 499, &c.

Every public act of Congress from 1803 till 1813, which authorized the President to take possession of Louisiana, or to establish therein a temporary government, and every law which related to the subject, contained an express guarantee of property; the same guarantee was also given by the President in 1810, when in virtue of the act of 1803, he took forcible and military possession of the disputed territory. And Congress confirmed this guarantee by their secret acts of 1811 and 1813; unless protection to the inhabitants of the territory consisted in confiscating their lands, and depriving them of the property acquired under the government and laws of Spain, while she held possession with the consent of the United States. Every act of the executive and legislative branches of the government, shows that the contest with Spain was for the right of sovereignty over the territory, and the propriety in the vacant land therein; not for the right to what had been granted according to the laws of Spain, or which had otherwise become private property. 6 Peters, 735.

Claiming the territory between the Perdido and the Mississippi by the Louisiana treaty, the United States were bound, by the express terms of the second article, which included "Islands belonging to Louisiana, all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices, which are not private property." 7 Peters, 87, 88. No land which was not vacant, (no land which was private property,) passed to the United States, but was excepted from the cession, not only by the second article, but by the guarantee by the United States, to the inhabitants in the third article, of the free enjoyment of their property, until their admission into the Union. From the pledge to maintain and protect this right, the United States never set up any absolution, or from the pledge to hold the territory subject to future negotiation. What was considered as vacant land by the executive department

in 1810, has been seen by the letter of the Secretary of State, on the same day as the proclamation of the President, that land which was to be thrown into the common stock, with all the other vacant land of the United States, for the national uses of all the people thereof; land which remained as a part of the royal domain when the United States took possession in virtue of the treaty of 1803, which was not private property.

This state of things as to government and property in the disputed territory, fully justified the view which the executive department of the government took of this subject in 1832, which was in perfect accordance with the proclamation of the President twenty-two years before, and with the course of the legislature from 1811 to 1819, in relation to the rights of private property in the disputed territory, held under grants of the Spanish authorities, before the United States took possession. It was by both departments the most solemn recognition of the principle, that a contest between the two governments concerning territorial boundary, did not and should not impair individual rights of property, and of its practical operation on grants made by the government in possession; and such recognition carried with it the most sacred obligations, to carry that principle out in all its consequences, independently of any stipulation in the treaty of 1819.

By the third article of the Louisiana treaty, the United States were bound to protect and maintain the inhabitants of the ceded territory, " in the free enjoyment" of their " property," until they were incorporated into the Union; and when so incorporated, to admit them " to the enjoyment of all the rights, advantages, and immunities of citizens of the United States." From the moment of such incorporation, the Constitution of the United States, and its amendments, interposed between the inhabitants and the legislative power of the United States the same guarantee which any citizen of any other state had a right to claim for the enjoyment of his property; and every proprietor, alien, or citizen, had the same constitutional right to invoke the protection of the judicial power of the state or Union, against the invasion of his rights of person or property, wherever he might be located. 2 Peters, 235.

That such incorporation was by acts " of sovereign power by the United States," exerted by military operations, expelling the existing authority of Spain, and compelling the inhabitants to submit to that of the United States, so far from diminishing, increases their constitutional and treaty obligation; for such forced submission is in the nature of articles of capitulation, the observance of which is enjoined by the laws and practice of all civilized nations. 1 Peters, 542. The proclamation of the President and the acts of Congress declared the terms on which the United States established their authority; the inhabitants submitted, and thereby became entitled to the threefold protection of the Constitution, treaty, and law of nations. 2 Dall. 1, &c.

Had Spain made a voluntary transfer of the allegiance of her

[Lessee of Pollard's Heirs *vs.* Kibbe.]

subjects in this part of Louisiana, as she did in the residue, the duty of the United States could not have been doubted; it never has been doubted by any department of the government, or any member of it, as to every other portion of the territory ceded by the treaty of 1803; and the universal opinion of the people and government has been, that the rights acquired, and the obligations imposed by that treaty, were throughout concomitant. Spain, indeed, might deny the right of the United States west of the Perdido, to have become in any way strengthened by the annexation of that part of Louisiana to the adjacent states, by an act of war or mere sovereign power; but when the United States undertook to construe and execute the treaty in their own way; and as they did in asserting their rights accruing by the cession; every rule and principle of national honour, faith, and law, would be violated, if they should deny their duty to comply with the terms of the treaty, which alone gave them any right, or with the pledges which they gave when they took possession in virtue of its stipulations.

It matters not by what right the United States held the disputed territory, at the time of its incorporation into the Union; had it been done without the colour of right, or had East Florida been so incorporated before the treaty of 1819, the consequences would have been the same.; by the very and sole act of such incorporation, the inhabitants became citizens of the United States, their property was protected, and alien proprietors became entitled to all rights secured to them by any treaty between their sovereign and the United States.

In addition to these considerations, the acts of Congress from 1803 till 1811, before the United States took forcible possession, which, as the President declared in his proclamation in 1810, were "so framed" as to apply to that territory whenever the contemplated eventual possession by the United States should take place, secured to the inhabitants every protection which those laws, the treaty, and ordinance of 1787 could impart; and no subsequent law has attempted to impair any right thus secured, denied its existence, or asserted any right in the United States to lands which were private property in 1810. A more clear and correct exposition of the policy and course of the United States cannot be presented than the following remarks of the Secretary of the Treasury, in presenting a plan for the final adjustment of all claims by Spanish grants, pursuant to resolutions of the Senate and House of Representatives in 1818.

"In presenting a plan of final adjustment, in which no other description of claims are comprehended than those which are founded upon patents and concessions issued by the several governments which have at different times exercised sovereign jurisdiction over the late province of Louisiana, as held by France, the undersigned, &c. has proceeded upon the conviction that ample provision has already been made for the adjustment of all claims to lands contemplated by the resolution founded upon evidence inferior to patents and con

2 I 2                    48

cessions. He has arrived at this conviction by a careful examina
tion of the several acts of Congress for ascertaining and adjusting
land titles in Louisiana, which have been passed since the 20th
day of December, 1803, the period at which possession was taken
of that province by the United States. This long series of acts,
commencing with the 26th March, 1804, and terminating with the
29th April, 1816, presents an uninterrupted and uniform course of
relaxation in favour of land claimants of every description. This
relaxation has generally been effected by comprehending descrip-
tions of cases not recognised by previous acts, by extending the
time within which notices of claims and production of evidence
were required, and by giving authority not only to decide upon such
claims, but to revise and confirm such as had been previously rejected.
When it is considered that in all these respects relaxations have been
frequent, and that the evidence upon which the claims have in the
first instance, and in each successive revision been decided, has in
most cases been that alone which has been produced by the party
in interest, it is extremely improbable that injustice has been done
by the rejection of claims which ought to have been confirmed."

"Considering then that the titles to lands in the state of Louisiana,
west of the east boundary of the island of New Orleans, so far as
they are derived from or dependent upon any act of Congress, are
correctly and finally settled; nothing more is necessary than to pre-
scribe a rule by which the validity of titles not dependent upon the
acts of Congress may be promptly and legally determined," &c.
3 State Pap. Public Lands, 393.

The Secretary then presented a bill providing for the final adjust-
ment of claims to lands throughout the whole extent of Louisiana,
including those in the disputed territory, but it was not enacted into
a law; Congress however continued to act as they had before done,
in a spirit of unceasing liberality towards claimants, each successive
law relaxing from the strictness of former ones.

This is apparent from an inspection of the various acts of Con-
gress from 1805, in relation generally to claims to land in Louisiana;
as the principles of this case require a reference only to those laws
which relate to the territory between the Perdido and the Missis-
sippi, the others need not be noticed any farther than in the preced-
ing general review by the Secretary of the Treasury, and the fol-
lowing declaration made by this Court in 1827, in reference to the
legislation of Congress, which is quoted in the opinion in the pre-
sent case : that "the United States have never, so far as we can dis-
cover, distinguished between the concessions of land made by the
Spanish authorities within the disputed territory, whilst Spain was
in the actual occupation of it, from concessions of a similar character
made by Spain within the acknowledged limits." 12 Wheat. 600,
601.

This declaration will be found to be fully justified by a reference
to all the acts of Congress, in relation not only to their whole terri-
tory acquired by the treaty of 1803, but to that which was acquired

by the compact or treaty of cession between Georgia and the United
States, in 1802. By this compact, Georgia ceded to the United
States the right of soil and jurisdiction, to all the territory within her
chartered boundaries, which was situated west of the Chatahouchee,
on certain conditions; one of which was, that all grants of land
made by the British or Spanish governments, before the 25th Octo-
ber, 1795, &c., should be confirmed; to carry which into effect, vari-
ous laws were passed in 1803, 1804, and 1805. 2 Story, 894. 952.
966. These acts related to the territory north of 31° of latitude,
which had been the subject ˜f controversy between the govern-
ments of Florida, while under Great Britain, and Georgia, within
which the governor of West Florida had made grants before the
cession to Spain by the treaty of peace in 1783; within which
Spain made grants from that time till 1797, when she gave up pos-
session to the United States; and within which Georgia had also
made grants up to the Mississippi. It was, therefore, in the strictest
sense, disputed territory, claimed by the three parties, the United
States, Spain, and Georgia, at the date of the grants. The laws re-
lating to the adjustment of titles to land therein, necessarily referred
to grants made by a government de facto, which the United States
denied was a government de jure; and the laws, being on a kindred
subject, would of course be analogous in their provisions, and re-
ceive the same construction, as those which related to the territory
which was in dispute between the United States and Spain, from
1804 till 1821.

In examining the provisions of all the laws for adjusting the claims
to lands in Louisiana and Florida, they will be found to be patterned
from those in relation to the compact with Georgia; and, as will be
seen hereafter, have been construed alike by this Court. The first
law which related exclusively to claims to land west of the Perdido,
was passed in 1812; the previous laws applied generally to Lou-
isiana as ceded by the treaty, making no distinction between that
part which was disputed, and that which was in the possession of the
United States, as surrendered in 1803. But as the practical operation
of the laws of the United States depended on the President, in his
execution of the authority conferred on him by the act of 1803,
2 Story, 907; it is evident, that these laws could not be carried into
effect by establishing land offices and organizing boards of commis-
sioners to adjust claims to land within that part of the territory,
which was at the time occupied and governed by Spain. No govern-
ment can exercise legislative powers within the territory actually in
the possession of another sovereign; this can be done only when
such possession is displaced by force, or surrendered by treaty, or
otherwise; hence it appears, that no provision was made for the
adjustment of claims to lands west of the Perdido, till by the Presi-
dent's proclamation, the resolution and acts of Congress, the United
States had obtained possession of the greater part of West Florida.
Then the act of 1812 provided for the appointment of commis-
sioners, with the powers conferred by former laws; directed all

claimants to lands in the disputed territory, to deliver notice and evidence of their claims within a limited time, and to state the written evidence thereof; whether the claims arose under the British, French, or Spanish governments, together with the nature and extent thereof, &c., &c. Provided, That where the claim is by a complete grant, it shall not be necessary to have any other evidence entered than the original grant, order of survey, and plot of the land. On failure to deliver notice of the claim as required by law, the claim shall never after be confirmed or recognised by the United States, or any written evidence thereof, which shall not be recorded, ever after be admitted in evidence in any Court of the United States, against any grant which may thereafter be made by the United States. 2 Story, 1235. The commissioners are empowered to inquire into the justice and validity of all claims filed with them; and it is made their duty to ascertain whether the land claimed has been inhabited and cultivated, when it commenced, when it was surveyed, by whom, on what authority; and every matter which may affect the justice and validity of the claim; to arrange the claims into classes, according to their respective merits, and to make a report thereon for the final action of Congress. 2 Story, 1235. By the act of 1814, the commissioners were directed to receive evidence in support of any claims not embraced in the former law. 2 Story, 1427. Pursuant to these laws, reports were made by the commissioners classifying the claims thus:

1. Claims founded on complete British, French, or Spanish grants, which in their opinion are valid, agreeably to the laws, usages, and customs of such governments; in all four hundred and thirty claims.

2. Claims founded on orders of survey, (requette,) permission to settle, or other written evidence of claim derived from either government, which ought to be confirmed; in all four hundred and twenty-six claims.

3. Claims founded on complete grants said to be derived under such governments, which, in the opinion of the commissioners, are not valid; in all fifty-eight claims.

4. Claims founded on orders of survey, &c., which ought not to be confirmed; in all two hundred and ninety-eight.

5. Claims of actual settlers not derived from either government; in all one thousand four hundred and twenty. Vide, Reports of Commissioners. 3 State Papers, Public Lands, 6, 7. 5. 38—48. 13. 58, 59. 66, 67—76. 254—268.

The reasons for rejecting the third and fourth classes of claims, are founded on the fourteenth section of the act of 1804; that they were made after the cession by France to the United States; that the grants were unusually large, and made after Spain had ceased to have any right or interest in the soil: but it is added, "Admitting the claim of the United States to the country above mentioned to be unquestionable, (and I see no reason to doubt it,) the question then arises, how far the possession of that country by the Spanish government, after the right of the United States accrued, ought to

affect those claims which were granted by the former government, during the time which intervened between the purchase, and the time when possession was taken by the United States? If the United States had taken possession of West Florida at the same time that they did of Louisiana west of the Mississippi, many serious injuries to individuals might have been prevented. As this was not the case, it becomes an inquiry of interest and importance, whether the government is not morally bound, both by considerations of equity and policy, to make them a compensation commensurate to the injuries they may have sustained. This could be done by making them donations of any quantity of land which the government may deem just; particularly that class of claimants who have improved and cultivated their lands. They are not numerous; and with few exceptions, their claims are moderate. It may not be impertinent, also, to remark, that generally speaking, they were such persons as were most liable to be deceived by the Spanish officers.

"In relation to that class of claimants who have not inhabited or cultivated their lands, which is generally the case with those who hold large claims, it appears to the commissioner, that the government of the United States is not legally bound to confirm them. Nevertheless, from a variety of considerations which will, doubtless, enter into the decision of this question, the government may deem it politic either to confirm their claims to a certain extent, or in some other way to effect a compromise with them. Their unlimited confirmation would, in the opinion of your commissioner, seriously injure many individuals, some of whom probably resided on the lands before they were surveyed for the patentees." 3 State Papers, Pub. Lands, 66.

The reasons for adjudging the claims of the first class to be valid, are, that they "comprehend patents derived from the British and Spanish governments, at a time when they possessed and exercised the undisputed sovereignty of the soil; and they ought, in the opinion of the undersigned commissioner, to be confirmed by the United States." 3 State Papers, Pub. Lands, 66.

That he alluded to the sovereignty de facto, is evident; for the list of cases under this class is that in which there appear eighty-six cases of grants, made by Spain after the date of the Louisiana treaty; on twenty-seven of which no settlements were made till after the 20th December, 1803. This is the more apparent in the reasons for confirming the claims of the second class, under incomplete titles.

"Those made by Miro, &c. were originated by the Spanish authorities, prior to the purchase of Louisiana by the United States; and agreeably to the laws, usages, and customs of the then existing government, would have been completed by the same power that made them." 3 State Papers, Pub. Lands, 66.

In relation to the claims issued by Morales, subsequently to the aforesaid "purchase," &c. he observes that "although in his estimation they do not occupy the same grade with those of the first class,

yet he conceives it just and equitable that they should be confirmed. This opinion is not predicated upon the validity of their orders of survey, but simply upon the fact that they occupied and cultivated their lands, and complied with all the requisitions of the government, which at that time exercised ownership over the soil. By reference to the register, it will be seen that some of the last mentioned claims exceed in quantity the ordinary donations made by the Spanish government, prior to the purchase of Louisiana by the United States. When this is the case, it is believed the government of the United States may limit its confirmation to any extent which it may be deemed just, both in regard to the number of arpents in each tract, and the number of tracts claimed by the same person."

In this class of incomplete titles there are two hundred and sixty claims by orders of survey, &c. made after the treaty of 1803, on few of which settlements were made till after 20th December, 1803.

These reports were transmitted according to law, and laid before Congress in 1816. 3 State Pap. 6. In April, 1818, the Senate and House of Representatives instructed the Secretary of the Treasury to report a plan for the final adjustment and settlement of these claims; which he submitted in December following, accompanied with the draught of a bill enacted 3d March, 1819, and classing the claims as follows:

1. Claims founded on complete grants from the Spanish government, which are in the opinion of the commissioners valid, and agreeably to the laws, usages, and customs of the said government. The first section declares, that " they be, and the same are hereby, recognised as valid and complete titles, against any claim on the part of the United States, or right derived from the United States." And certain claims under British grants are so recognised. 3 Story, 1748.

2. Claims founded on orders of survey, permission to settle, requette, or any written evidence of claim derived from Spain before 20th December, 1803, and the land cultivated, &c. before that day; which in the opinion of the commissioners ought to be confirmed. The second section declares that they " shall be confirmed in the same manner as if the title had been completed." 3 Story, 1748. Burchard, 316.

3. All other claims comprised in the reports of the commissioners, and which ought, in their opinion, to be confirmed, " the claimant shall be entitled to a donation not exceeding one thousand two hundred and eighty acres," &c.

4. All persons embraced in the reports who have no written evidence of claim, and had settled the land claimed before the 15th April, 1813, " shall be entitled to the same as a donation," not exceeding six hundred and forty acres.

5. Every person in the list of actual settlers, who has no written evidence of title, and on the 12th April, 1814, had inhabited or cultivated a tract of land, " shall be entitled to a preference on becoming a purchaser."

Time for filing claims is extended, and provision is made for a revision of claims which had not been recommended for confirmation. Under the provisions of the act of 1819, the commissioners reported numerous other claims for confirmation, comprising all classes; (vide 3 State Papers, Pub. Lands, 436, 442, 447—451;) including lots in the town of Mobile; which reports were acted on by Congress by the act of 8th May, 1822, as to the lots in Mobile, 3 Story, 1860; and as to lands, by an act of the same date, 3 Story, 1867.

In both these acts the claims are classed as in the act of 1819; complete grants are recognised as valid, &c.; incomplete grants are confirmed, &c.; and donations made to settlers, &c. as was done by that act: and the last recognises the laws, usages, and customs of Spain, as the test of a grant being complete to vest the title.

Both the acts of 1819 and 1822 being founded on the reports of the commissioners in 1816 and 1820, must be taken with reference thereto; and recognising the claims therein reported as valid, to be complete titles, by their intrinsic effect. In the report of 1816, the commissioner says, those claims of the first class, "being founded on complete grants of former governments, we think are good in themselves on general principles, and therefore require no confirmation by the government of the United States to give them validity," (3 State Papers, 267;) and in that of 1820, that "they are certainly entitled to unqualified confirmation, (3 State Papers, 441;) and in relation to surveys on incomplete grants, the same rule is adopted in relation to those laws, customs, and usages.

Section fourth directs the register and receiver, &c. except in relation to perfect titles, as recognised in the first section of the acts of 1819 and 1822, shall have power to direct the manner in which all lands claimed thereby shall be surveyed and located; having regard to the laws, usages, and customs of the Spanish government on that subject, and also to the mode adopted by the United States. 3 Story, 1868. Burchard, 352. 4 Story, 2168.

Subsequent laws extended the time for filing claims, and various reports continued to be made and laid before Congress: these laws were more liberal in their provisions than former ones, in accordance with the general policy of Congress, and more especially on account of a strong remonstrance by the legislature of Louisiana on the subject. Vide 3 State Papers, 430. 432. Vide also 3 Story, 1907, 1909. 1968. 2009. 2017. Burchard, 312. 394. 404.

By the act of 1832, provision was made for the adjustment of all claims filed by 1st July, 1833; the sales of land in the disputed territory were suspended for one year; and where claims were unconfirmed, but were embraced within the provisions of previous laws, and the land had been sold by the United States, the owners were entitled to receive the purchase money for which the land was sold at public sale. 4 Story, 2303.

Pursuant to this act, reports were made and confirmed by the act of 1835, (4 Story, 2419;) and decisions in favour of land claimants

pursuant to the act of 1835, were confirmed by the act of 1836. 4 Story, 2514.

From this review of the course of the executive branch of the government in 1810, and the decisive opinion expressed in 1832, as to the title to land in the disputed territory being valid in the view of the United States and Spain, during the negotiations which preceded the treaty of 1819; and from the whole legislation of Congress from 1803 till 1836, there can remain no ground for mistaking their mutual understanding of the effect of the treaty of 1803, in its obligation on the United States to protect the private property of individuals in the disputed territory. In this respect the treaty of 1819 was not taken into consideration; for the United States were bound by every guarantee which a government could give to the people, as strongly as any new treaty would bind them; but a new treaty was necessary, to disencumber the disputed territory from the pledges under which the United States took and held possession from 1810.

To this state of the disputed territory, as developed in the preceding review in relation to its government, and the rights of private property during an adversary claim by Spain and the United States, and pending negotiations for seventeen years, the final treaty must be referred, in order to ascertain its bearing on this case.

The subjects of controversy were, the east and west boundary of Louisiana, according to the cession by Spain to France in 1800, and by France to the United States in 1803. The objects of the treaty were, 1. To define the west boundary; 2. To procure a cession of East Florida to the United States; 3. To settle the controversy as to the east boundary by a general cession and relinquishment of all the claims and pretensions of Spain east of the Mississippi; and 4. To stipulate the terms and conditions on which all past controversies should be terminated, and the cession made.

The title of the treaty shows its nature: "A Treaty of Amity, Settlement, and Limits;" its declared objects, and the intention of the parties are, "the adjustment of all differences," "to finally settle, determine, and adjust all differences and pretensions by a treaty," "the restoration and permanent establishment of mutual and sincere friendship, to consolidate, confirm, and forever maintain, the good correspondence which happily prevails, and with the most earnest desire of conciliation, and with the object of putting an end to all the differences which have existed between them." Vide the preamble to the treaty and the seventh article.

Art. 1. "There shall be a firm and inviolable peace and sincere friendship between the United States and their citizens, and his Catholic Majesty, his successors, and subjects, without exception of persons or places."

Art. 2. His Catholic Majesty cedes to the United States, "all the territories which belong to him east of the Mississippi, known by the name of East and West Florida," &c.; "and all vacant lands which are not private property."

Art. 3. The first clause fixes the west boundary of Louisiana at the Sabine, &c. By the second clause, his Catholic Majesty " cedes to the United States all his rights, claims, and pretensions to any territory east of said line ;" and forever renounced them.

Art. 8. Stipulates for the confirmation and ratification of " all the grants of land made before the 24th January, 1818, by his Catholic Majesty or his lawful authorities, in the said territories, ceded by his Catholic Majesty to the United States," &c.

It is not necessary to take any further notice of the other parts of this treaty, or give any detail of its provisions ; it suffices for all the purposes of this case, to consider it as having effected all its declared objects, according to the declared intention of the parties, without exception of persons or places. So both governments have ever considered it ; and the once disputed territory has been peaceably held by the United States, according to the terms of its stipulations, and not by the mere force of the Louisiana treaty, or " the acts of sovereign power," exercised by the United States previous to the ratification. The political departments of the government have uniformly recognised its application to the disputed territory, as a cession and renunciation by Spain of all her claims and pretensions, and thereby putting a final end to all existing differences and disputes concerning boundary, under the treaties of 1800 and 1803. This Court has also so considered it, by declaring in 1827, that " the United States, have since obtained the Floridas by purchase and cession from Spain," (2 Wheat. 600 ;) and in the first sentence of their opinion in Garcia vs. Lee, repeating this declaration in language which cannot be misapprehended or misapplied, and is in these words : " The land is situated in the state of Louisiana, and in the territory lying north of the Iberville, and between the Perdido and the Mississippi, which was so long a subject of controversy between the United States and Spain ; and which was finally settled by the cession of the Floridas to the United States, by the treaty of February 22d, 1819." 12 Peters, 515.

On this point, then, there is a perfect union of opinion by all the departments of the government, that this treaty applied to the disputed territory ; that it finally settled all former controversies concerning it, and that it was done by a cession by Spain, and a purchase by the United States.

These propositions are perfectly consistent with the assertion by the United States, of their original right to this territory under the former treaties ; they have bought their peace ; Spain has ceded her claims and pretensions : though neither party has acknowledged the original right of the other, (2 Peters, 310,) yet both agree that, for the future, it belongs to the United States, in full sovereignty and propriety, as it was claimed by Spain. If, indeed, any doubt could be raised on the terms of the treaty, the interest of the United States requires that they should be construed so as to effect the objects declared ; for if the cession and purchase do not include the disputed territory, the United States still hold it subject to future

negotiation, according to the declaration of the President in 1810, and Congress in 1811. It has not and cannot be asserted, with truth, that there is yet subsisting a controversy between Spain and the United States on this subject; nor can there be a suggestion of any act of cession, relinquishment by Spain, or any recognition of the right of the United States, unless it is found in the treaty of 1819; or any release of the pledge under which possession was taken by force, unless by the operation of its stipulations upon the territory thus seized; and further, if the confirmation of grants by the eighth article, does not extend to those made for lands west of the Perdido, the clause which annuls those made after 1818, and the grant to Vargas, is equally inapplicable to defeat them; and if there is any part of East or West Florida to which the treaty does not apply, or any exception of persons or places within either is made by any construction of any part of the treaty; it is an express contradiction of the first article, which negatives all exceptions. The treaty must then be taken as the Court have declared it; or all its stipulations must be confined to East Florida, and that part of West Florida which lies east of the Perdido, leaving all controversies before subsisting in full force, as to territory west of that river.

The nature and character of this treaty forbid an interpretation which would make it a violation of the honour and faith of the United States, so often pledged; and jeopard their interest by considering the disputed territory to yet be in their hands, subject to future negotiation: a conclusion from which there is no escape, if the negotiation which ended by the ratification of the treaty in 1821, did not settle all controversies. By referring to the terms of the ratification, there can be no doubt of the declared meaning of the King of Spain, and the treaty making power of the United States; as well as to what was ceded to the United States, as the effect and force of the treaty when ratified, and the ratifications exchanged. In the act of the king, it is important to observe, that he declares the cession to be made by the second and third articles; the bearing of which on the eighth article will be seen to have a most conclusive effect, when the case of Foster and Elam *vs.* Neilson comes under review. The king says:

"Whereas, on the 22d February, 1819, a treaty was concluded," &c., "consisting of sixteen articles, which had for their object the arrangement of differences and of limits between both governments, and their respective territories, which are of the following form and literal tenor." Here follows the treaty. "Therefore, having seen and examined the sixteen articles aforesaid, and having first obtained the consent and authority of the general Cortes of the nation, with respect to the cession mentioned and stipulated in the second and third articles, I approve and ratify all and every one of the articles referred to, and the clauses which are contained in them," &c., "promising on the faith and word of a king, to execute and observe them, and to cause them to be executed and observed, entirely, as if I myself had signed them," &c. &c.

In pursuance of the advice and consent of the Senate, the President declared:

"I," &c., "having seen and considered the treaty above recited, together with the ratification of his Catholic Majesty thereof, do," &c., "by these presents, accept, ratify, and confirm the said treaty, and every clause and article thereof, as the same are herein set forth;" and after the exchange of ratifications, declared: "Now, therefore, to the end that the said treaty may be observed and performed with good faith on the part of the United States," &c., "I do hereby enjoin and require all persons bearing office," &c., "and all others within the United States, faithfully to observe and fulfil the said treaty, and every clause and article thereof." 6 Laws U. States, 628. 631.

I cannot deem it necessary to reason on language like this, used in an act so solemn, by which two nations closed an inveterate controversy which had subsisted for seventeen years, on terms satisfactory to both; in order to show what they intended as a mutual object, or whether they effected what they intended. An inspection of the treaty from its title to the ratification, affords more conclusive evidence of its intention and effect than human ingenuity or reasoning can elicit by a commentary, or any effort to illustrate its provisions. It is what it purports, an amicable settlement of all past differences, without exception of persons or places, by a cession by one party of its rights to sovereignty, and the vacant land in the whole territory east of the Sabine river, which is not private property; what is private property is excepted from the cession by the terms of the second and third articles; and one of the conditions of the cession is, the confirmation and ratification of all grants made before a certain time for lands in the ceded territories, excepting three. Compensation is made for mutual claims; all past complaints are redressed, and the United States hold the disputed territory, freed from all past pledges by the consent of Spain; and the stipulated confirmation of grants made by the king or his lawful authorities, saves his honour and faith pledged to the grantees. Peculiar force is to be given to this stipulation in the eighth article, when it is considered that two full years elapsed between the signature and final ratification of the treaty; and that the sole cause of the delay arose from those grants, one of which was for land west of the Perdido. 2 Peters, 312. Those having been annulled by the king, were excepted from confirmation, leaving all other fair grants within the stipulations of the eighth article, according to the declared intention of both negotiators of the treaty, of the parties thereto, and its true construction. Another decisive consideration of the effect of this treaty is presented by taking it in connexion with the treaty of 1803, and the various acts of the political departments of this government before referred to; it applied to a territory which formed part of the states of this Union, and to its inhabitants, and other proprietors of land, who hold their property by the most sacred guarantee, and were already in the full fruition of

all the rights of citizens of the United States, and the states to which the territory had been annexed.

It must be remembered, that as the United States claimed the territory west of the Perdido, in virtue of the treaty of 1803, they must hold it subject to its obligations and the terms of the cession; and that by first governing it as a portion of the territory of the United States, and afterwards annexing it to the adjacent states, the rights of property were protected by the ordinance of 1787, the constitution of the states, and of the United States. No new guarantee was given to the grantees of Spain in the disputed territory, by the treaty of 1819; but it was a renewal of all former pledges of the United States by the treaty of 1803, their acts, and the constitution, to neither of which Spain was a party; but as Spain would neither cede nor abandon her claim without a renewed pledge of nation to nation, in the most solemn of all international acts, the pledge was renewed both to the king, his subjects, and grantees; which was additional to all the previous promises and obligations of the United States to protect property, fairly and lawfully acquired, and maintain its free enjoyment.

There is another view, in which the treaty of 1819 must be considered, in order to give it its constitutional and intended effect, by operating directly on all the subjects to which it relates, where no future act is stipulated to be done by either party, or the thing stipulated is in its nature to be performed in future, as the incorporation of the territory and its inhabitants into the Union, which is necessarily a prospective act. But the cession by the king, and the confirmation of grants, must be taken to be acts done and perfected by force of the treaty itself, and by the terms of the ratification by both parties; for it is difficult to conceive how every article and clause of the treaty can be ratified and confirmed, "by these presents," or how it can be observed and performed by civil officers and others, if any future act of legislation is necessary to give it validity or effect, by the king as to the cession, or by the United States as to the clause of confirmation. If the question was new, it would seem to be settled by the Constitution; for if a treaty made under its authority, is a supreme law of the land, it would be a bold proposition, that an act of Congress must be first passed in order to give it effect as such; and equally bold to assert, as the American view of the faith of treaties by the law of nations, that its stipulations may be performed or not, at the discretion of Congress. If on the principles of the law of nations, or national faith, one treaty should be held more sacred than another, that of 1819 stands in bold relief as a settlement of past controversies, on mutual considerations and stipulations, so dependent on each other, that the non-performance by either party of any part, would necessarily defeat the whole object and effect of the treaty, and renew old disputes. Thus, if the disputed territory and its inhabitants and proprietors, "are excepted places" and "persons;" then there has been no cession to the United States by the king, and no confirma-

tion of his grants stipulated for by the treaty; both nations stand towards each other on their original right, and the rights of individuals to property remain as if no treaty had been made, and negotiation still continued; whereas, if the territory west of the Perdido, is ceded by the treaty, every clause has full effect.   There is a most marked distinction between the two treaties in one respect: by that of 1803, there was an out and out purchase of territory, to which the United States had no claim or pretension; both parties dealt at arms' length; there was nothing to compromise, no previous differences to settle; the subject of the cession was a province owned by France, in the plenitude of sovereignty, in propriety and dominion, in her actual possession as a government de facto and de jure, which she ceded to the United States for a specified money consideration. 2 Peters, 303.

Another distinction is equally marked and prominent.   In the Louisiana treaty, there is no stipulation by the United States, for the confirmation of grants of any description, previously made by France or Spain; or any other security promised for private property, than the terms of the cession by the second article imply, by ceding "vacant lands," &c., "which are not private property;" and the stipulation in the third article, to incorporate the inhabitants in the Union as soon as possible, &c., and admitted to the enjoyment of the rights of citizens of the United States; and in the mean time, be protected and maintained in the free enjoyment of their property.   1 Laws of the United States, 136.   The reason of this distinction is obvious.

Though the treaty of 1803 made no provision for a change of government, it was in the first instance to be temporary and territorial, under the sole power of Congress, in virtue of the third section, fourth article of the Constitution; and afterwards a state government, subject only to the same powers which Congress could exercise in the old states.   1 Peters, 542.   9 Peters, 234. 236.

No change of government was contemplated, or could be made by the treaty of 1819, except as to the territory east of the state of Alabama; as all westward to the Mississippi then formed a part of three states; and the incorporation thereof and the inhabitants into the Union was completely effected (in virtue of the treaty of 1803) two years before the ratification of the Florida treaty.  Vide 2 Peters, 308, 309. 311, 312.   Hence arose the difference between the corresponding articles of the two treaties; that of 1819, in the sixth article, stipulating only for the incorporation of the inhabitants, &c. and their admission to the rights, &c. of citizens of the United States; omitting any stipulation as to property, save by the eighth article, which was coextensive with the whole ceded territory east of the Mississippi, and superseded the necessity of any further stipulation to protect property; and the Constitution placed the government of the territory east of the Perdido in Congress, under the general powers conferred by the third section of the fourth article.

From the course of the political departments of the government.

2 K 2

I now proceed to that of the judicial department, on this and kindred subjects.

1. As to the treaty of 1803, its construction, and effect on private property in Louisiana.

2. The decisions of this Court on claims to land east of the Perdido, under the treaty of 1819.

3. Decisions on claims to land in disputed territory, under that and previous treaties.

4. The decisions on articles of capitulation, and treaties between the United States and foreign powers.

5. The decisions on compacts of boundary between state and state, and states with the United States.

6. How far questions of titles to land in a disputed territory are judicial.

On this, as on the former branch of the subject, my object is to show, 1. A perfect coincidence of opinion between all the departments of the government, on the subject of Spanish titles under the two treaties: 2. That if my opinion is at variance with that of this Court in 12 Peters, 515, &c. it arises from my entire concurrence with their declaration in that case, that the treaty of 1819 finally settled the long subsisting controversy between the United States and Spain, about the territory between the Perdido and the Mississippi: 3. That every principle of the case of Foster and Elam *vs.* Neilson, in 2 Peters, 299. 317, adverse to grants in the disputed territory, has been since overruled: 4. That the principles of that case, which stand affirmed in all subsequent cases, give full validity to such grants: 5. That the case of Poole *vs.* Fleeger has no bearing on the treaty of 1819: and 6. That any decision of this Court adverse to such grant, founded solely on the supposed authority of those two cases, and at variance with a uniform course of adjudication, before and after; may be deemed worthy of reconsideration.

1. In Soulard *vs.* The United States, this Court declared, that the United States, as a just nation, regarded the stipulation of the third article of the Louisiana treaty, for the protection of the property of the inhabitants, "as the avowal of a principle which would have been held equally sacred though it had not been inserted in the contract." 4 Peters, 515, S. P.   10 Peters, 330.

"That the term 'property,' as applied to lands, comprehends every species of title, inchoate or complete;" those rights which lie in contract, executory or executed.   "In this respect, the relation of the inhabitants to their government is not changed.   The new government takes the place of that which has passed away." 4 Peters, 512.

"This is the sentiment by which the government of the United States is animated, and which it has infused into its legislation." 4 Peters, 512.

In alluding to this stipulation, the Court say, in Delassus *vs.* The United States, "that the perfect inviolability of property   among these rights, all will assert and maintain."

"The right of property then is protected and secure   by this

treaty; and no principle is better settled in this country, than that an inchoate title to lands is property." 9 Peters, 133.

"Independent of treaty stipulation, this right would be held sacred."

"The language of the treaty excludes every idea of interfering with private property; of transferring lands which had been severed from the royal domain. The people change their sovereign. Their right to property remains unaffected by the change." 9 Peters, 133.

In the City of New Orleans vs. De Armas it was held, that a patent from the United States, pursuant to an act of Congress, could not "operate to destroy any previous existing title, vested under the pre-existing government, as a principle applicable to every grant, that it cannot affect pre-existing titles." 9 Peters, 236.

In the United States vs. Smith, it is laid down as a settled principle by the Court, that if the king had by his own, or the acts of his lawful authorities, become a trustee for the claimant of lands, it amounted to the severance thereof from the royal domains, (10 Peters, 331;) and that the United States have put themselves in the place of Spain. 10 Peters, 335.

In New Orleans vs. The United States, the effect of the Louisiana treaty was most fully and ably considered by the Court, in a unanimous opinion. The property in controversy was the quay in front of the city, which was claimed by the city by a dedication thereof to its use by France and by Spain. The United States claimed it as part of the royal domain, and as such ceded to them by the treaty; on which the Court thus speak: "If the common in contest, under the Spanish crown formed a part of the public domain, or the crown lands, and the king had power to alien it as other lands, there can be no doubt that it passed under the treaty to the United States, and they have a right to dispose of it the same as other public lands. But if the King of Spain held the land in trust for the use of the city, or only possessed a limited jurisdiction over it, principally, if not exclusively for police purposes, was the right passed to the United States under the treaty?" 10 Peters, 736.

This question is answered in the decision of the Court, " that, in their opinion, neither the fee of the land in controversy, nor the right to regulate its use, is vested in the United States." 10 Peters, 737.

2. As this opinion can neither require or receive any weight by any remarks of mine, I now proceed to notice the adjudications of this Court in cases arising under the Florida treaty, in relation to the territory east of the Perdido, including East Florida.

The first was the American Insurance Company vs. Canter, in which the opinion of the Court is too important to be referred to otherwise than in their words: "The course which the argument has taken will require that in deciding this question the Court should take into view the relation in which Florida stands to the United States." 1 Peters, 542.

"The Constitution confers absolutely on the government of the

Union the powers of making war and of making treaties; conse-quently that government possesses the power of acquiring territory, either by conquest or by treaty.

"The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by the treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed; either on the terms stipulated in the treaty of cession, or on such as its new master shall impose. On such transfer of territory, it has never been held that the relations of the inhabitants with each other undergo any change. Their relations with their former sovereign are dissolved, and new relations are created between them and the government which has acquired their territory. The same act which transfers their country transfers the allegiance of those who remain in it; and the law, which may be denominated political, is necessarily changed; although that which regulates the intercourse and general conduct of individuals, remains in force until altered by the newly created power of the state.

"On the 2d February, 1819, Spain ceded Florida to the United States. The sixth article of the treaty of cession contains the following provision: "The inhabitants of the territories which his Catholic Majesty cedes to the United States by this treaty 'shall be' incorporated in the Union of the United States, as soon as may be consistent with the principles of the federal Constitution; and admitted to the enjoyment of the privileges, rights, and immunities of the citizens of the United States."

"This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities of the citizens of the United States. It is unnecessary to inquire whether this is not their condition independent of stipulation. They do not however participate in political power—they do not share in the government, till Florida shall become a state. In the mean time, Florida continues to be a territory of the United States; governed by virtue of that clause of the Constitution which empowers Congress to make all needful regulations respecting the territory or other property belonging to the United States."

"It has been already stated, that all the laws which were in force in Florida while a province of Spain, those excepted which were political in their character, which concerned the relations between the people and their sovereign, remained in force until altered by the government of the United States. Congress recognises this principle, by using the words 'laws of the territory now in force therein.' No laws could then be in force but those enacted by the Spanish government." Ibid. 544.

These principles apply to all parts of Florida, as ceded by Spain, under either treaty, and to the disputed territory, as well as other parts of either cession; the local laws in force at the time the treaties respectively took effect, were the rules of property and right

under. both ; and if the treaty of 1819 was the law of the land in 1828, and under the sixth article, the effect of the stipulations was to admit the inhabitants to the enjoyment of the rights, &c., which were promised, by its own force, operating in presenti upon the subject; ingenuity will be pushed to its utmost stretch to give a different effect to the eighth article. As the words of the Court admit of no exception or qualification, that article must operate in like manner to ratify and confirm all the grants to which it relates, in all parts of the ceded territories, whether within the states to which it had been annexed, or that which was east of the Perdido.

The principles of this opinion also apply with full force to the law of nations, as it bears on the relations between the United States, and the people and proprietors of the disputed territory, consequent upon the treaty of 1803, the military occupation in virtue of the right of the United States, by that cession, from 1810 to 1821 ; as a conquest by the right of war, or as a new acquisition by the cession of Spain in 1821, subject to the stipulation it contained. Take it in any way, the law of nations protected all rights of property, from whatever power those rights arose; and it is not a little remarkable, that every principle of this case was overlooked at the next term, and this treaty declared not to be the law of the land.

Next came the case of Foster and Elam *vs.* Neilson, in 1829, wherein the majority of the Court, against the opinion of the Chief Justice and Justice ———, held, that, in relation to the grants referred to in the eighth article of the treaty, it was only a contract on the part of the United States, to ratify and confirm them by an act of Congress, which was necessary to execute that part of the treaty; the opinion of the Court taking no notice of the law or usage of nations, or of any former decisions. But the Court were unanimous in their opinion, that if the eighth article had declared that all grants, &c., shall be valid to the same extent as if the ceded territories had remained under the dominion of the king, or " that these grants are hereby confirmed, the treaty would have acted directly on the subject, and would have repealed those acts of Congress which were repugnant to it." 2 Peters, 314. That if the second article had omitted the words, " which belong to him," the " United States, by accepting the cession, might have sanctioned the right to make the cession, and have been bound to consider the eighth article as coextensive with the second. The stipulation of the eighth article might have been construed to be an admission that West Florida, to its full extent, was ceded by this treaty." Ibid. 311. " That if the ratification by the king was an exception to the stipulation of the eighth article for confirming grants, the excepted grants would have been withdrawn from the eighth article, by the exception, and would otherwise have been within its provisions." " Consequently, that all other fair grants, within the time specified, were as obligatory on the United States as on his Catholic Majesty." Ibid. 313.

It is evident, therefore, that so far as this case depended on the construction of the treaty, it turned on three positions : 1. Whether the

second article ceded the whole territory of West Florida. 2. Whether the words of the eighth article operated directly on the grants, so as to confirm them by its own force. 3: Whether the ratification by the king operated as an exception to the eighth article, by excluding the three grants. Now, had the Court noticed the third article, in connection with the second, as was done by the king in his ratification, all difficulty respecting the words, " which belong to him," would have been removed; for the king declares that the cession was by both articles. 6 Laws U. S. 628.

By the first clause of the third article, " the boundary line between the two countries west of the Mississippi," is the Sabine, to the 32° north latitude, thence north to Red river, &c. By the second clause, the parties agree to cede and renounce all their rights, &c., to the territory described by that line; the United States to all west and south of it; and, " in like manner, his Catholic Majesty cedes to the United States, all his rights, claims, and pretensions, to any territories east and north of said line, and for himself, his heirs, and successors, renounces all claim to the said territories forever." 6 Laws U. S. 616.

The words of this clause are broad enough to embrace the whole territory east of the Mississippi; the words " claims" and " pretensions," are peculiarly appropriate to that part which lies west of the Perdido : and, when taken in connection with the second article, divest it of all the doubts, by the use of the words " which belong to him." So that their combined effect is a cession by one party, and an acceptance by the other, of all the rights, claims, and pretensions of Spain, to all the territory east of the Sabine, including what was known as East and West Florida, and to which the stipulation of the eighth article would apply, by the opinion of the Court.

The second point was decided in the United States vs. Arredondo, in 1832, in which the Court held, " That the United States never seem to have claimed any part of what could be shown by legal evidence and local law, to have been severed from the royal domain before their right attached," (6 Peters, 717;) whether the severance was by " patent, grant, concession, warrant, order of survey, or any other act which might have been perfected into a complete title, by the laws, usages, and customs of Spain." Ibid. 721.

" If a question arises what lands were ceded, (to the United States,) the answer is found in the second article, vacant lands; not those which had been individually appropriated, and were not the subjects of a hostile and adversary grant. The renunciation by the third article, by both parties, was only of their respective rights, claims, and pretensions to the territory renounced; neither government had any right to renounce over lands, to which a title had been conveyed to their citizens or subjects respectively. Thus deciding on those articles of the treaty, and in conformity to the rules and principles before established, we should be of opinion, that the land embraced in the grant was no longer a part of the royal domain at the date of the treaty, but private property, land not vacant,

but appropriated by a prior and valid deed." Ibid. 735, 736. "The eighth article was evidently intended for the benefit of those who held grants, and were considered as proprietors of land in Florida; and to give it a construction which would remove and limit rights thus intended to be secured, would deprive them of the benefit of the fair construction of the second and third articles of the treaty, and leave them in a worse situation than if the eighth had been omitted altogether." "The honour of the king was concerned most deeply, in not doing an act which would deprive his subjects of what he had granted to them," &c., "and to not leave the confirmation of grants by lawful authority, at the pleasure of the United States." Before the execution of the treaty, there was inserted a stipulation in "Spanish, by which the ceded territory should pass into the hands of the United States, with the declared instruction by the King of Spain, that the grants referred to operated in presenti, as. an exception and reservation of lands granted in his name, and by his authority, using words which expressed his intention in his own language; that the grants were ratified and confirmed in the very act of cession, subject to no future contingency." Ibid. 737.

Such was declared to be its effect, according to the stipulations of the treaty, the law of nations, the acts of Congress, and the laws of Spain. "If the title was confirmed presently, the king had within the bounds of the grant, no right or title to convey, and the United States, could receive none. If no future act of theirs was neces-sary for their confirmation and ratification, the legal title, much less the beneficial interest never passed to them, (the United States.) Ibid. 738. On a deliberate construction of that article, the words, "shall be ratified and confirmed," were held to mean, "shall re-main ratified and confirmed; and that the United States, in accept-ing the cession, could assert no claim to lands thus expressly ex-cepted;" and the Court declared explicitly, that the grants included in the eighth article, and those referred to in the ratification by the king, "were confirmed and annulled respectively, simultaneously with the ratification and confirmation of the treaty, and that when the territory was ceded, the United States had no right in any of the lands embraced in the confirmed grants." Ibid. 741, 742.

The same principles were adopted in the United States *vs.* Per-cheman, and in language most emphatic and unequivocal, through-out the opinion delivered by the Chief Justice. After reciting the first clause of the second article, which ceded the territory in general terms, the Court observe: "A cession of territory is never under-stood to be a cession of the property of the inhabitants." 7 Peters, 87. "The king cedes that only 'which belonged to him;' lands he had previously granted were not his to cede. Neither party could so understand the cession; neither party could consider itself as attempting a wrong to individuals, condemned by the practice of the whole civilized world." The second clause of the second ar-ticle, is thus referred to: "The special enumeration could not have been made, had the first clause of the article been supposed to pass

the objects thus enumerated, but private property also." 7 Peters, 87. The grant of buildings could not have been limited by the words, "which are not private property," had private property been included in the cession of the territory.

" This state of things ought to be kept in view, when we construe the eighth article of the treaty, and the acts of Congress relating to Spanish titles. This (the eighth) article is apparently introduced on the part of Spain, and must be intended to stipulate expressly, for that security to private property, which the laws and usages of nations would, without express stipulation, have conferred. No construction which would impair that security for them, that its positive words require, would seem to be admissible. Without it the titles of individuals would be as valid under the new government, as under the old," &c.

The Court then declare, that this article means, that the grants "shall remain ratified and confirmed to the persons in possession of them, to the same extent, &c., (that the same grants would be valid if the territories had remained under the dominion of his Catholic Majesty,) thus conforming exactly to the universally received doctrine of the law of nations. If, as we think must be admitted, the security of private property was intended by the parties; if this security would have been complete without the article, the United States could have no motive for insisting on the interposition of government, in order to give validity to titles, which, according to the usages of the civilized world were already valid." Ibid. 88, 89. The grants are then declared to be ratified and confirmed by the force of the treaty itself, as the proper if not unavoidable construction of its words; and the Court also declares that this construction would have been given in Foster vs. Elam, if the Spanish part of the treaty had been brought to their view; and that "this understanding of the article must enter into our construction of the acts of Congress on the subject." Ibid. 89.

These cases finally settled the construction of the second, third, and eighth articles of the treaty of 1819; they overruled the construction given in Foster and Elam vs. Neilson, and have remained unquestioned till this time. 12 Peters, 519; and "on the fullest consideration (it has been) held, that the treaty operated as a present, perfect, and absolute confirmation of all the grants which come within its provisions. That no act of the political department remained to be done; that it was an executed treaty, the law of the land, and a rule for the Court; a rule of title and property," &c. 12 Peters, 747.

In the United States vs. Kingsley, decided in 1838, the Court took broader ground in favour of Spanish titles, than had been assumed in any former case in relation to the construction of the treaty, and expressed their opinion in language of peculiar force, and with a more appropriate reference to its spirit, meaning, and words, than is to be found in any other opinion. "Under the treaty it is true that grants of land made before the 24th January, 1818, by his Ca-

tholic Majesty, or by his lawful authority, stand ratified and confirmed, to the same extent that the same grants would be valid if Florida had remained under the dominion of Spain," &c., &c.

"It is admitted, that in the construction of this article of the treaty, (the eighth) the United States succeeds to all those equitable obligations, which we are to suppose would have influenced his Catholic Majesty to secure to his subjects their property, and which would have been applied by him in the construction of a conditional grant to make it absolute. And further, in the construction of this article of the treaty, it must be conceded, that the United States must maintain the rights of property under it, by applying the laws and customs by which those rights were secured, before Florida was ceded, or by which an inchoate right of property would, by laws and customs, have been adjudicated by Spanish authority to have become a perfect right, by applying in the first instance in such cases, as was said in Arredondo's case, the principles of justice, according to the rules of equity; and in the second, all those laws and customs decisive of a right of property, while the party claiming the right was a subject of Spain." 12 Peters, 484, 485.

This final result of the adjudications of this Court settles all doubts as to the extent and effect of the cession and the construction of the treaty, which were expressed by the Court in Foster and Elam *vs.* Neilson, and is decisive of the two first points. Their opinion in the case of the United States *vs.* Clarke, in 1834, is equally decisive of the question whether the ratification by the king, in annulling the three grants to Alagon, Punon Rostro, and De Vargas, is an exception or proviso to the eighth article; on which subject this is the language of the Court, in 8 Peters, 463: "While Florida remained a province of Spain, the right of his Catholic Majesty, acting in person or by his officers, to distribute lands according to his pleasure, was unquestioned. That he was in the constant exercise of this power was well known. If the United States were not content to receive the territory, charged with titles thus created, they ought to have made, and they would have made, such exceptions as they deemed necessary. They have made these exceptions. They have stipulated that all grants made since the 24th of January, 1818, shall be null and void. It is understood that this stipulation was intended to embrace three large grants made by the king, which comprehended nearly all the crown lands in East Florida. However this may be, it shows that the subject was in the mind of the negotiator; and the apprehended mischief was guarded against, so far as the parties could agree. The American government was content with the security which this stipulation afforded, and cannot now demand further and additional grounds. The acquisition of the Floridas was an object of immense importance to the United States. It was urged by other considerations of a still more powerful operation, in addition to vacant lands. It will be regarded, while our Union lasts, as the highest praise of the administration which made it, and of the negotiator who accomplished it. It cannot be doubted.

Vol. XIV.—2 L

that the terms were highly advantageous, and that they were so considered by all. The United States were satisfied, and had reason to be satisfied, with the provision excluding grants made subsequent to the 24th January, 1818, when the fraud on that provision was prevented by the terms of the ratification of the treaty. All other concessions made by his Catholic Majesty, or his lawful authorities, in the ceded territories, (in the ratification by the king of Spain, "competent authorities,") are as valid as if the cession had not been made." 8 Peters, 464.

The same principle is recognised and declared in the United States *vs.* Mitchell, 9 Peters, 735; and Strother *vs.* Lucas, 12 Peters, 439 : in both of which there is a summary review of all the previous decisions of this Court on the subject; which are declared, in 9 Peters, 734; "to be definitively settled, so far as the power of this Court can do it; and must be taken to be the rules of its judgment."

I content myself with this general reference to these summaries of past decisions, with the exception of the settled meaning of the words "lawful authorities," in the eighth article, and "competent authorities," in the ratification by the king; that is, by those persons who exercised the granting power by authority of the crown. This is the generally received meaning of the words. The treaty recognises the existence of those "lawful authorities," in the ceded territories. 8 Peters, 449. The king "might therefore stipulate for that full credence (evidence) to the instrument itself, which is usually allowed to instruments issued by the proper officer." In the sense in which the words "are uniformly used and understood, they mean persons authorized by the crown to grant lands," (8 Peters, 450. 464;) the governor or intendant, as the case may be, (9 Peters, 735,) "or their deputies." 10 Peters, 331, S. P. 12 Peters, 438, 439.

Had these principles, thus settled, in the cases of Canter, 1 Peters, 542; in Soulard, 4 Peters, 512; Arredondo, 6 Peters, 717, &c.; Percheman, 7 Peters, 87, &c.; Clark, 8 Peters, 449. 463; Delassus, 9 Peters, 133; Mitchell, 9 Peters, 734; New Orleans, 9 Peters, 234, and 10 Peters, 736; Strother, 12 Peters, 435—441; Kingsley, 12 Peters, 484; and Rhode Island, 12 Peters, 747, been recognised in Foster and Elam; the decision of the Court in that case, on their declared principles, must have been in favour of the plaintiff, if he had filed and recorded his claim, according to the requisitions of the acts of Congress. As the Court decided that case solely on their construction of the treaty, the since established construction, if then adopted, would have made the treaty a rule of decision for the Court, have confirmed the grant by its own force, and repealed the fourteenth section of the act of 1804, and all repugnant laws; and made all grants before January, 1818, as obligatory on the United States as they were on Spain, excepting only the three which were cancelled by the ratification of the king. 2 Peters, 311—315.

3. I now proceed to the cases which have arisen in this Court under the treaty of 1819, in relation to grants of land within the disputed territory, made after 1803; and under the kindred treaty

[Lessee of Pollard's Heirs *vs.* Kibbe.]

between Georgia and the United States, on grants made by Great Britain and Spain, while those governments occupied the territory in dispute between them, (Georgia and the United States.)

Harcourt *vs.* Gaillard arose on a grant made by the British governor of West Florida, for land north of the 31° N. lat., and within the charter limits of Georgia; but which was then under the government, and in the possession of Great Britain.   The grant was held void, because it was made during the war of the Revolution; and the treaty of peace contained no stipulation in favour of grants previously made, or any cession of territory to the United States; but was an acknowledgment and recognition of their pre-existing rights.   But the Court also held, that if the grant had been made before the war, " it might have had the benefit of those principles of public law which are applied to territories acquired by conquest;" but the question " is one of disputed boundaries, within which the power which succeeds in war is not obliged to recognise as valid any acts of ownership exercised by his adversary."   12 Wheat. 525.   The Court then refer to the eighth article of the treaty of Ghent, as an illustration of this doctrine, which is this: " It is agreed, &c. that in case any of the islands, &c. which were in the possession of one of the parties prior to the commencement of the present war between the two countries, should, &c. fall within the dominions of the other party, all grants of land made previous to the commencement of the war, by the party having had such possession, shall be as valid as if such island, &c. had been adjudged to be within the dominions of the party having had such possession," &c.   1 Laws U. S. 699. Whereupon the Court use this language: "And such is unquestionably the law of nations.   War is a suit prosecuted by the sword, and when the question to be decided is one of original claim to territory; grants of soil made flagrante bello by the party that fails, can only derive validity by treaty stipulation."   Laws U. S. 528.

The next case arose on a grant made by the Spanish government of West Florida, in 1795, before the treaty of limits between Spain and the United States, for land north of the 31° north latitude, of which Spain was in possession at the time of the grant; the Court decided this case on the same principles as were adopted in Poole *vs.* Fleeger, and applied to the compact between Kentucky and Tennessee.   These were the principles laid down in their opinion: " It is the usage of all the civilized nations of the world, when territory is ceded, to stipulate for the property of its inhabitants," &c. " Had Spain considered herself as ceding territory, she would not have neglected a stipulation, which every sentiment of justice and national honour would have demanded, and which the United States would not have refused.   But instead of requiring an article to that effect, she has expressly stipulated for the withdrawal of the settlements made within what the treaty admits to be the territory of the United States, and for permission to the settlers to bring their property with them.   We think this an unequivocal acknowledgment, that the occupation of that territory by Spain was wrongful; and

we think the opinion thus clearly indicated, was supported by the state of facts. It follows, that Spanish grants, made after the treaty of peace, can have no intrinsic validity; and the holders must depend for their titles on the laws of the United States." Henderson vs. Poindexter, 12 Wheat. 535, 536. Vide 11 Peters, 209, 210.

The statement of this case by the Court, in a preceding part of their opinion, gives a most lucid illustration of the principles above referred to. After alluding to the treaties of peace between Great Britain and the United States, France and Spain, in 1783, the Court say, "In the treaty with Spain, the Floridas were ceded to that power without any description of boundary." "The United States continued to assert a claim to the 31° of north latitude, while Spain maintained perseveringly her pretensions further north. This was the subject of long and fruitless discussion between the two governments, which was terminated by the treaty, &c., of 27th October, 1795, &c. This treaty declares and agrees that the line which was described in the treaty of peace between Great Britain and the United States, as their south boundary, shall be the line which divides their territory from East and West Florida."

"This article does not import to be a cession of territory, but the adjustment of a controversy between the two nations. It is understood as an admission that the right was originally in the United States," &c. 534.

This opinion is confirmed by a subsequent part of the same article. That "the settlements of either party in the territory of the other, according to the above mentioned boundaries, shall be withdrawn within six months after the ratification of this treaty, or sooner, if it be possible; and that they shall be permitted to take with them all the goods and effects which they possess." 12 Wheat. 534, 535. 544.

This state of facts in Harcourt vs. Gaillard, and Henderson vs. Poindexter, shows the grounds on which the British grant, made before the treaty of peace with Great Britain, and the Spanish grant, made before the treaty of 1795, with Spain, for lands within the disputed territory, while in the possession of those powers, as governments de facto, were held not to be valid under those treaties or the law of nations, to have been exclusively these. The British grant was made flagrante bello, the treaty of peace neither ceded or relinquished any territory to the United States, or to particular states; it was a solemn recognition and acknowledgment of their pre-existing rights.

The Spanish grant, though made during peace, became void by the admission of Spain, in the treaty of 1795, of the original right of the United States to the territory in which the land was situated; by the express stipulation, that the settlers within the boundary established, should remove, with their effects, within a stipulated time; and that there was no stipulation in the treaty, for the protection of the inhabitants, in the enjoyment of property held under Spanish grants previously made.

There was another feature, common to both cases, which was noticed by the Court, growing out of the compact with Georgia, and consequent acts of Congress. This compact was made by " article of agreement and cession," entered into the 24th April, 1802, " between the United States and the state of Georgia," in virtue of an act of Congress, " for an amicable settlement of limits with that state," and a law thereof.

By art. 1. " Georgia cedes to the United States all the right, title, and claim to the jurisdiction and soil of the lands within her boundary, west of the river Chatahouchee, upon the following express conditions, and subject thereto, that is to say," &c. Secondly, " That all persons who, on the 27th October, 1795, (the date of the treaty with Spain,) were actual settlers within the territory thus ceded, ' shall be confirmed' in all the grants legally and fully executed prior to that day, by the former British government of West Florida, or by the government of Spain, and in the claims which may be derived from any actual survey or settlement made under the act of the state of Georgia," &c., passed 7th February, 1785.

By art. 2. " The United States accepted" this cession, on the conditions therein expressed, and ceded all their right, title, and claim to soil and jurisdiction, of any land east of the line of cession, by Georgia to the United States.

By art. 3. " The present act of cession and agreement shall be in full force as soon as the legislature of Georgia shall have given its assent to the boundaries of this cession," &c. No law or other act of assent was therefore necessary by the United States to give it full effect.

In April, 1802, Georgia passed an act to ratify and confirm the agreement, which enacted, " That the said deed or articles of agreement and cession be, and the same hereby is, and are fully, absolutely, and amply, ratified and confirmed in all its parts; and hereby is and are declared to be binding and conclusive on the said state, her government, and citizens forever." 1 Laws U. S. 488.

The act of Congress under which this compact was made, authorized the commissioners appointed by the United States, " to adjust and determine," " all interfering claims of the United States and Georgia, to territory west of the Chatahouchee, north of 31° north latitude, and south of the cession made by South Carolina," &c. 1 Story, 494. A subsequent act gave them power, " finally to settle by compromise," &c., " any claims mentioned in the former act, and on behalf of the United States, to receive a cession of any lands therein mentioned, or of the jurisdiction thereof, on such terms as to them shall seem reasonable." Ibid. 779.

Subsequent laws provided for carrying this compact into effect. 2 Story, 893. 952. 955.

By now comparing the treaty of 1819, with the treaty of peace with Great Britain, in 1783, it is palpable that it contains no recognition or acknowledgment of the pre-existing right of the United States to the disputed territory; it therefore does not come within

the principles which the Court applied to the British grant, arising from the nature of that treaty; nor does the principle of the law of nations, in relation to grants made during a war, apply to grants made by Spain, between 1804 and 1810, while in peaceful possession of the territory. A comparison of the two treaties with Spain, places them in more striking contrast in their titles and the stipulations of their respective articles. That of 1795 was declared to be a "Treaty of Friendship, Limits, and Navigation;" that of 1819, was declared to be a "Treaty of Amity, Settlement, and Limits."

The declared object of the first was "to establish several points, the settlement whereof will be productive of general advantage and reciprocal utility to both nations." Vide 1 Laws U. S. 262. Its stipulations have been noticed. The declared object of the second was to "settle, terminate, and put an end to all their differences and pretensions," so as "to consolidate on a permanent basis," &c.

Art. 5. "The inhabitants of the ceded territories shall be secured in the free exercise of their religion without any restriction; and all those who may desire to remove to the Spanish dominions, shall be permitted to sell or export their effects at any time, without being subject, in either case to duties."

Art. 6. "They shall be incorporated into the Union," &c.; "and admitted to the enjoyment of all the rights, privileges, and immunities of citizens of the United States."

Art. 7. "The officers and troops of his Catholic Majesty," &c., "shall be withdrawn, and possession of the places occupied by them shall be given within six months after the exchange," &c.

Art. 8. "All grants of lands," &c., "shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid, if," &c.

This treaty, it must be remembered, had been preceded by the same mutual claims and pretensions of both parties, perseveringly maintained, during long and fruitless discussions between the two governments, as had been the case before the treaty of 1795; and that the possession of the territory was held by the United States, under the most solemn pledges by the President and Congress, that it was in their hands, subject to future negotiation, and that the inhabitants should be protected in the enjoyment of their liberty, property, and religion.

Now let this treaty have the benefit of the principles of the law of nations, which were laid down by the Court in the two cases in 12 Wheaton, as a treaty of cession, settlement, and peace, or as a relinquishment by Spain and purchase by the United States, or as a compact, deed, or articles of agreement; let it receive the same construction and effect, as was given to the agreement, or as the Court called it, the treaty with Georgia, and then it can be ascertained what would have been the result, had the grants in those cases been protected by any treaty stipulation. Let, also, the acts of Congress which related to claims under the treaty with Georgia, be compared with those which related to the country west of the

[Lessee of Pollard's Heirs *vs.* Kibbe.]

Perdido especially, passed before 1821; together with those passed since the treaty was ratified, for the adjustment of titles to land, and the same construction be applied to all, as the Court-gave to the former; a satisfactory answer can be given to those questions.

1. Under such a treaty, would private property be protected by the law of nations, if the fifth, sixth, and eighth articles had been omitted?

2. Under the fifth, could the inhabitants who remained in the province, in the enjoyment of their religion, be deprived of their property?

3. Could those who chose to remove, give a good title to tne property which they might choose to sell, whether it was lands or chattels?

4. Under the sixth, till their incorporation into the Union, can the inhabitants enjoy the rights, privileges, and immunities of American citizens, if the United States can confiscate their lands, by declaring their titles void, and granting them to others; and could this be done after their incorporation?

5. Under these, and the eighth article, is it optional with the United States to confirm or confiscate?

6. Had there been no treaty, would not the grants have been valid under previous pledges by the United States, and the laws annexing the disputed territory to the adjacent states?

7. Without a treaty or specific pledge, would not the Constitution of the United States protect the inhabitants in their rights of persons and property, by the very act of such annexation, accepted by a state?

8. Are they not so protected, as the inhabitants of a territory of the United States, under the ordinance of 1787, which was in force in this territory?

9. Does not the law of nations give to these grants the same protection as in the case of conquest, or military occupation, until Congress shall, in virtue of the law of a conqueror, declare them void, and resume the lands?

And, 10. Can questions arising in cases brought to recover property embraced by such grants, be decided by the Courts of the United States, in virtue of the judicial power of the Constitution, and twenty-fifth section of the Judiciary Act of 1789, or by special tribunals appointed under the acts of Congress, with power to decide on the validity of titles acquired under such grants?

So far as the solution of these questions depends on the stipulations of the treaty of 1819, and the laws of nations applicable thereto, the principles laid down by the Court in Harcourt *vs.* Gaillord, and Henderson *vs.* Poindexter, already quoted, are so full, and so completely answer them, as to save the necessity of repeating them. That treaty presents the reverse of those then under consideration, and the grant in the present case, is one which must have been then held valid on every ground assumed by the Court in favour of the grants then before them, had they come within the

rules and principles on which the Court made the distinctive line between the different kinds of treaties.

But when we apply them to the grant in the present case, it is a matter of much surprise, that there could exist a doubt of its validity. Independently of the treaty, it was protected by the law of conquest, military occupation, cession, or relinquishment; independently, too, of any of these considerations, the property of the plaintiff in the land granted, was protected by the acts of the United States, under which their military occupation or acquisition begun and was continued. And, independently of all other considerations, it was protected by the stipulations of a treaty of cession, amity, settlement, and limits, every clause whereof was accepted, ratified, and confirmed by the treaty-making power of the United States, and proclaimed as binding on them, by its constitutional effect.

At the same term in which Harcourt *vs.* Gaillard, and Henderson *vs.* Poindexter were decided, the case of Delacroix *vs.* Chamberlain, came up; the controversy arose on a concession of land in the disputed territory; and as the opinion of the Court, taken in connection with the two preceding cases, and the case of Canter. 1 Peters, 542, decided at the next term, is of decisive bearing on this case, it is given at large.

"The concession referred to in the bill of exceptions, is upon its face, not a grant, nor a survey, but it is, as is expressed in the bill of exceptions, only a warrant or order of survey, authorizing the deputy surveyor to make a survey, and to report to the intendant the survey when made, in order to found a grant upon it. The order of survey bears date the — day of ——, 1806. At that date, the Spanish authorities were in the actual possession of Mobile, where the land lies; and they claimed it as part of the Floridas, then belonging to the Spanish crown. The United States claimed it as part of Louisiana. But it is not necessary to investigate these conflicting claims. The United States have since obtained the Floridas by purchase and cession from Spain, without having previously settled the controverted boundary between the Floridas as claimed by Spain, and Louisiana as claimed by the United States. A question of disputed boundary between two sovereign, independent nations, is, indeed, much more properly a subject of diplomatic discussion and of treaty, than of judicial investigation. If the United States and Spain had settled their dispute by treaty, before the United States extinguished the claim of Spain to the Floridas, the boundary thus fixed would have concluded all parties. But as that was not done, the United States have never, as far as we can discover, distinguished between the concessions of land made by the Spanish authorities within the disputed territory, while Spain was in the actual possession of it, from concessions of a similar character made by Spain within the acknowledged limits. We will not, therefore, raise any question upon the ground of any want of authority in the intendant to make the concession. No question of that sort appears to have been made in the Court below.

Assuming, then, the authority of the Spanish intendant to make the concession and warrant of survey, the question made and decided in the District Court fairly arises : was it a sufficient title to recover upon in an action of ejectment? If the concession had been made in a country, where at the time the principles and practices known to the common law prevailed, it would not bear a contest. It would be regarded, at most, as an incipient, inchoate right, but not a perfect, legal estate. It would not be such title as would maintain an action of ejectment. Was it a perfect, legal estate ; was it a title according to the Spanish law which prevailed at Mobile at the time it was made? We apprehend not."

"It shows upon its face that other acts of sovereignty remained to be done to perfect the title, and which the sovereign power might withhold. A survey was to be made; and according to the laws and usages of Spain, a formal grant was to be made in such cases, to complete the title.

"It may be admitted that the United States were bound in good faith by the terms of the treaty of cession, by which they acquired the Floridas, to confirm such concessions as had been made by warrants of survey; yet it would not follow, that the legal title would be perfected until confirmation. The government of the United States has throughout acted upon a different principle, in relation to these inchoate rights, in all their acquisitions of territory, whether from Spain or France. Whilst the government has admitted its obligation to confirm such inchoate rights or concessions as had been fairly made, it has maintained that the legal title has remained in the United States, until by some act of confirmation it was passed or relinquished to the claimants. It has maintained its right to prescribe the forms and the manner of proceeding in order to obtain a confirmation, and its right to establish tribunals to investigate and pronounce upon their validity." Ibid. "This is demonstrated by the laws which Congress have repeatedly passed, establishing boards of commissioners to investigate these claims, and to reject or confirm them, or report them to Congress in cases of doubt; and by the acts of Congress requiring all such claims to be recorded within prescribed periods. It does not appear that this order of survey has ever been recorded, or passed upon by the board of commissioners, or register of the land office, established by Congress in the district in which the land lies. It can therefore derive no aid from the laws of the United States." 12 Wheat. 600. 602.

In conclusion, the Court affirmed the judgment, because an ejectment could not be sustained on the order of survey. Ibid. 603.

But had this been a legal title, complete in form, granting the legal estate, and duly recorded, there could have remained no doubt that the plaintiff would have recovered, as his case came within every principle of the preceding cases of Harcourt *vs.* Gaillard, Henderson *vs.* Poindexter, of which the leading one is this: that "all the acts of Congress on the subject of grants within the disputed territory, under the compact with Georgia, presuppose the validity of

those which were legally and fully executed before the 25th October, 1795." 12 Wheat. 528, 529. 536. The articles with Georgia were in themselves a confirmation of titles within its provisions, (539;) protected by them, (540;) and confirmed by them. And by the acts of 1819 and 1822, perfect grants were expressly recognised as complete titles.

If these opinions of this Court require additional support to entitle them to respect, it will be found in Keene *vs.* M'Donough; in which, by a decree of a Spanish Court, rendered in 1804, at Baton Rouge, which is within the disputed territory, lands were sold and conveyed to the defendant's grantor, who held them under such decree and sale; and this is the language of this Court in affirming its validity:

" The adjudication having been made by a Spanish tribunal, after the cession of the country to the United States, does not make it void; for we know historically that the actual possession of the territory was not surrendered until some time after these proceedings took place. It was the judgment, therefore, of a competent Spanish tribunal, having jurisdiction of the case, and rendered whilst the country, although ceded, was de facto in the possession of Spain, and subject to Spanish laws. Such judgments, so far as they affect the private rights of the parties thereto, must be deemed valid.

"This view of the case supersedes the necessity of considering the question of prescription." 8 Peters, 310.

This Spanish tribunal, it must be remembered, was the governor of the province, acting in his judicial capacity, in which he had power by the Spanish law to order a sale of land; which passed the title of the proprietor to the purchaser, on the execution of a deed, which was deemed the strongest and safest conveyance known to the jurisprudence of Spain. In his political capacity, the same governor had power to dispose of the royal domain, and to make valid grants thereof, which conferred a perfect right of property in the lands so granted. It would therefore be a novel principle in American jurisprudence, if while this governor, by judicial power, could transfer the property of A. to B., he yet could not by political power, so far dispose of the public domain as to bind the king, in whose name and by whose authority he acted as his direct representative; or even affect his conscience as a trustee, in virtue of the grant, to the grantee. And if the king was so bound by a perfect grant, or became a trustee by a mere concession or order of survey, the United States succeeded to the obligation of the king to perfect the title, according to the laws, usages, and customs of Spain; and the grant or concession stood "ratified and confirmed" under the treaty, to the same extent at least, as a judgment did before it. 12 Peters, 484.

The two first of these cases establish these principles: that grants of land in a disputed territory, made by a government in possession thereof, during peace with a nation which is entitled to its dominion and propriety, are valid by the law of nations, without any treaty stipulation; if made during war, they are not valid unless protected

by the treaty: that when territory is acquired by a cession, or relinquishment of one nation to another, or by conquest, the rights of private property are protected by the law of nations; according to the law of the territory, though no stipulation is contained in the act of cession or relinquishment; and even in case of conquest, no other change is effected except as to government: and that when a stipulation for property is required, it is never refused; and when made, is sacredly observed. But when, by a treaty or compact, one nation or state admits the original right of the other to the disputed territory, without any stipulation in favour of the inhabitants, as to lands held by grant under the party which admits the right of the other, the treaty binds their rights, and the grants are not valid against the party whose original right is acknowledged. S. P. 11 Peters, 209, 210.

Delacroix *vs.* Chamberlain established the application of the treaty of 1819 to the disputed territory, as a cession thereof by Spain, a purchase by the United States, and a settlement of former controversies concerning it, (S. P. 12 Peters, 515;) that the grants and concessions made by Spain while in possession, are on the same footing as in other parts of Florida; that the United States are bound in good faith to confirm imperfect titles, and has admitted its obligation to do so, when the inchoate title has been fairly made. And when, in the case of Canter, this Court declared, that this treaty is the "law of the land," (1 Peters, 542,) the omission of any reference to either of these cases in the opinion in Foster and Elam, shows most clearly that they were not considered by the Court; and when the principles they established are properly considered, it cannot be doubted, that had they been noticed by the majority, the judgment would have been different, for they covered every point in the case.

In Percheman's case, the Court unanimously assert, that if the Spanish part of the treaty had been within their view in Foster and Elam, they would have given it the same construction as they afterwards did; and it is not disrespectful in me to say, that a similar result must have followed, if the four last decisions of the Court had been under their consideration.

The silence in the opinion in Foster and Elam, can by no just rule be taken to overrule either of those cases; it lays down no antagonist principle, except that the treaty remained a mere contract till Congress executed it by a law; it was as silent on the law of nations as on former adjudications; yet it will not be pretended, that it was meant to controvert or abrogate those principles which are consecrated by "the usage of the civilized world." 12 Wheat. 535.

That opinion admits of no such interpretation, when carefully examined, from 2 Peters, 299—317, it will be found to turn entirely on the since overruled construction of the treaty, and the non-filing of the plaintiff's claim; nor, with that exception, is there a single principle laid down which militates with former decisions in any

respect. And if the since exploded construction of the treaty is stricken from the opinion; and the principles of Arredondo, Percheman, Clarke, and all subsequent cases are inserted in its place, it will be found that there is not a stronger case in favour of the validity of grants in the disputed territory. The case arose on one of that description; the Court tested its validity by the treaty, which they construed in reference to its language alone, as applicable to the whole ceded territory, without adverting to any distinction in its construction, between grants within or without the disputed territory; on the contrary, it was expressly held, that the treaty would apply to a grant west of the Perdido, if it was construed as it has been ever since; and that the eighth article would have confirmed even the rejected grants, had they not been excepted by the ratification. 2 Peters, 312, 313.

When the true construction of the treaty is infused into that opinion, it supports every position on which the plaintiff's title rests; and the doubts which have arisen upon it, can be attributed to no other cause, than by misapprehending its principle; or by viewing the overruled construction as restored, without a reference to the ground on which the decision was placed, or appreciating the principles which would have followed; by considering the treaty as self-executed by its own intrinsic force. In which case the Court declare, that the grant would have been valid, within the disputed territory.

It has been supposed, that the opinion in that case went on the ground, that questions of title to lands, arising on Spanish grants in the disputed territory, between 1803 and 1810, were of a political, and not judicial character; depending on the construction of the Louisiana treaty, as to its eastern boundary. But no such principle is to be found in the opinion: the question of boundary is taken to be settled, and not open to judicial inquiry; yet all other questions affecting the validity of the grant, are throughout considered as open and of judicial cognisance: had boundary and title been considered to be identical, the Court would have been saved from the labour which they took, to show that the title was invalid on other grounds; for when the Perdido was taken as the true boundary, all grants west of it were consequently void, if title depended on boundary.

This is another source of misapprehension of this opinion, which has of late given to it an importance, after it had remained unnoticed in any opinion of the Court after Percheman's case, till 1838.

After the opinion in that case was promulgated, the turning principle of Foster and Elam, was universally understood to be overruled, and its authority ceased to be relied on; and it was not even quoted by the counsel of the United States in the argument of Percheman's case, though the aid of Arredondo was invoked. Vide, 7 Peters, 59. 62.

It is not a little strange that it should now be taken to be a leading case on Spanish titles, when its vital principle is extinguished-

by an unquestioned series of decisions to the contrary, and all the principles which remain unshaken, are decidedly in favour of a conclusion directly the reverse of that to which the Court arrived, on their then erroneous construction of the eighth article, and the ratification of the king. If, then, the case of Foster and Elam is yet to be considered as a leading or authoritative one, it can be only as to the boundary of Louisiana, which is a concessum; on every other principle of that case, which is not now admitted to be overruled, and to stand overruled, I rely as supporting the plaintiff's title; and by now infusing into it the universally received and admitted construction of the treaty, consider it as decisive of this case, without the aid of the acts of 1824 or 1836.

It is somewhat remarkable, that there is no one opinion of this Court, or any of its members, which even questions any one principle of the law of nations, as laid down in the cases of Harcourt vs. Gaillard, Henderson vs. Poindexter, Insurance Company vs. Canter, United States vs. Soulard, Arredondo, Percheman, Delassus, Mitchell, Strother vs. Lucas, and Rhode Island vs. Massachusetts; in the latter of which these principles are reiterated. "There are two principles of the law of nations, which would protect them, (the inhabitants of a disputed territory,) in their property. 1. That grants by a government de facto, of parts of a disputed territory in its possession, are valid against the state which had the right. 2. That when a territory is acquired by treaty, cession, or even conquest, the rights of the inhabitants to property are respected and sacred." 12 Peters, 748, 749.

If the reference to Poole vs. Fleeger, in 12 Peters, 521, is to be considered as questioning any principle of the law of nations, to which the above named cases refer, it must have arisen from relying on two passages of the opinion in Poole vs. Fleeger, detached from the context immediately preceding and succeeding them.

When the whole opinion in 11 Peters, 209. 211, is taken in connection with the terms of the compact between Kentucky and Tennessee, it will be found that the case turned on the precise principles of Harcourt vs. Gaillard, and Henderson vs. Poindexter, as is abundantly manifest from the turning and decisive point in the case.

The Circuit Court instructed the jury, "that the state of Tennessee, by sanctioning the compact, admitted in the most solemn form, that the lands in dispute were not within her jurisdiction, nor within the jurisdiction of North Corolina at the time they were granted; and that, consequently, the titles were subject to the conditions of the compact," which was the ground of the exception and writ of error to this Court. After referring to the law of nations and the Constitution, the learned judge who delivered the opinion of the Court proceeded to assign their reasons.

" The compact, then, has full validity, and all the terms and conditions of it must be equally obligatory upon the citizens of both states."

" Independently of this broad and general ground, there are other ingredients in the present case, equally decisive of the merits.

" Although in the compact, Walker's line is agreed to be in future the boundary between the two states, it is not so established as naving been for the past, the true and rightful boundary ; on 'the contrary, the compact admits the fact to be the other way. While the compact cedes to Tennessee the jurisdiction up to Walker's line, it cedes to Kentucky all the unappropriated lands north of latitude 36° 30' north. It thus admits what is in truth undeniable, that the true and legitimate boundary of North Carolina, is in that parallel of latitude, &c. It goes further, and admits that all claims under Virginia to lands north of that boundary shall not be prejudiced by the establishment of Walker's line ; but such claims shall be considered as rightfully entered or granted. The compact then does, by necessary implication, admit, that the boundary between Kentucky and Tennessee is the latitude 36° 30' north, and that Walker's line is to be the true line only for the purpose of future jurisdiction.

" In this view of the matter it is perfectly clear, that the grants made by North Carolina and Tennessee were not rightfully made, because they were originally beyond her territorial boundary ; and that the grant under which the claimants claim was rightfully made, because it was within the territorial boundary of Virginia. So that upon this narrower ground, if it were necessary, as we think it is not, to prove the case, it is clear that the instruction of the Court was correct." (Vide Robinson *vs.* Campbell, 3 Wheat 218—220.) In that case, the compact between Virginia and Tennessee, made in 1802, contained a stipulation in favour of grants by the latter, which were held to be valid ; so that taking the two compacts, and the decisions upon them, they fully illustrate and affirm the principles of the two cessions. 12 Wheat. 525. 535.

It is thus apparent, that an erroneous view has been taken of the principles on which Poole *vs.* Fleeger was decided ; and that when the whole opinion is considered, it does not impugn, but affirms an established rule, which is an exception to the general principle, that grants of land in a disputed territory, by a government de facto, in possession, are valid.

The same error appears to have occurred in the view which is taken of the opinion in Foster and Elam, in the passages extracted from it, in 12 Peters, 517—519, and in the same manner—by not carefully and closely 'examining the immediate context. Thus the long extract from 2 Peters, 309, when referred to the preceding sentence, relates solely to " acts of sovereign power," by the United States, before the ratification of the treaty, and to acts done in virtue of the treaty of 1803 alone, and to boundary, as the only political question involved in that case. So as to the passages extracted in 12 Peters, 518, 519, from 2 Peters, 311. 313. The first, when connected with the context preceding and following it, refers to the second and not the eighth article of the treaty of 1819 ; the other,

[Lessee of Pollard's Heirs *vs.* Kibbe.]

when referred in the same manner to the preceding context, will be found to be only the conclusion which resulted from the since overruled construction of the eighth article, and ratification of the king.

I trust it will not be deemed improper or disrespectful to have made these remarks in relation to this view of the two cases of Poole *vs.* Fleeger and Foster and Elam, which have been thus noticed after the most thorough examination; the view seems to me to have been a mistaken one, which may well be accounted for by the late period of the term, and the broad field of investigation, which became opened by the course of the argument, and the nature of the case in 12 Peters, 515.

On a comparison of the compact between Tennessee and Kentucky, with the treaty of 1819, the contrast between them is striking. By the former, Tennessee admitted, in the most solemn form, the original right of Kentucky; while in the latter, neither party admitted the previous right of the other, but, as held in Foster and Elam, (2 Peters, 310,) each had uniformly and perseveringly insisted on their respective rights. The Court also held, that "it is then a fair inference from the language of the treaty, that he (the king) did not mean to retrace his steps, and relinquish his pretensions; but to cede, on a sufficient consideration, all that he claimed as his; and, consequently, by the eighth article, to stipulate for the confirmation of all the grants which he had made while the title remained in him." This language requires no comment.

The Court also held, that the United States did not admit the right of Spain; and add, "It is not improbable that terms were selected which might not compromise the dignity of either government, and which each might understand consistently with its former pretensions." 2 Peters, 311.

Thus it appears that Foster and Elam presents a decisive answer to any argument founded on Poole *vs.* Fleeger, which tends to controvert any one principle of the law of nations, laid down in any opinion of this Court, in relation to treaties or compacts between nations or states; and in the whole course of adjudication on these subjects, the Court has decided with perfect uniformity and consistency, from 1827 till 1838, on all titles in the various territories acquired by the United States in 1802, 1803, and 1821.

In doing so, the Court have taken no new ground, but have followed in the old and beaten path, trodden first by the Federal Court of Appeals, in 1781, and pursued by this tribunal from its first organization.

4. In Miller *vs.* Miller, the case arose on articles of capitulation, and the Court held, that the case must be decided by the resolves and ordinances of Congress, when they applied; when they were silent, by the laws, usages, and practice of nations; and that a stipulation that the inhabitants shall enjoy all the rights and privileges of subjects of the conquering nation, is a compact which puts them on the same footing as if they had been native subjects, and secures their property from confiscation even by the rights of war. 2 Dall.

1—11. So in Johnson vs. M'Intosh, "the rights of the conquered to property should remain unimpaired, and the new subjects should be governed as equitably as the old." 8 Wheat. 589.

"When the conquest is complete, and the conquered inhabitants can be blended with the conquerors, or be safely governed as a distinct people, public opinion, which not even the conqueror can disregard, imposes those restraints upon him, and he cannot neglect them, without injury to his fame and hazard to his power." 8 Wheat. 590.

"The Constitution of the United States declares a treaty to be the supreme law of the land. Of consequence, its obligation on the Courts of the United States must be admitted.

"It is certainly true, that the execution of a contract between nations, is to be demanded from, and generally superintended by the executive of each nation, &c. But where a treaty is the law of the land, and, as such, affects the rights of parties litigant in Court, that treaty as much binds their rights, and is as much to be regarded by the Court, as an act of Congress; and on this principle it was held, that a stipulation in a treaty that property 'shall be' restored, operated as an immediate restoration, and annulled a judgment of condemnation previously made." United States vs. The Peggy, 1 Cranch, 109, 110.

The fourth article of the treaty of peace with Great Britain, in 1783, stipulated that creditors shall meet with no lawful impediment to the recovery of debts. The sixth article stipulated, that there "shall be" no future confiscations, and that persons in confinement "shall be" immediately set at liberty, and prosecutions commenced be discontinued. The ninth article of the treaty of 1794 stipulated, that British subjects, &c., "shall continue to hold lands," &c.

In Ware vs. Hylton, it was held, that the treaty of peace repealed and nullified all state laws, by its own operation, revived the debt, removed all lawful impediments, and was a supreme law, which overrules all state laws on the subject, to all intents and purposes; and is of equal force and effect as the Constitution itself. 3 Dall. 235. 239. 240. 281. 284.

In Hopkins vs. Bell, the treaty was held to repeal the Virginia statute of limitations. 3 Cranch, 453. 457.

In Hunter vs. Martin, the treaty of 1794 was held to be the supreme law of the land; that it completely protected and confirmed the title of Fairfax, even admitting that the treaty of peace had left him wholly unprovided for; that as a public law, it was a part of every case before the Court, and so completely governed it, that in a case where a treaty was ratified after the rendition of a judgment in the Circuit Court, which was impeachable on no other ground than the effect of a treaty, the judgment was reversed on that ground. 7 Cranch, 727. S. C. and S. P. 1 Wheat. 336. 370. S. P. 3 Wheat. 599. 4 Wheat. 462, 463. 490.

The treaty of 1778, with France, stipulated that the subjects of France shall not be reputed aliens; and it was held, that it gave

them the right to purchase and hold lands in the United States, and in that respect put them on the precise footing as if they had become citizens. 2 Wheat. 270. 277. S. P. 4 Wheat. 464. 7 Wheat. 544. 8 Wheat. 493, 494. 10 Wheat. 189. 1 Wheat. 301. 9 Wheat. 496.

So in the Pizarro, it was held, that the stipulation in the fifteenth article of the treaty of 1795, with Spain, that free ships "shall make free goods," protected enemies' property as fully as that of a neutral. 2 Wheat. 242.

5. The decisions of this Court on compacts of boundary between states, are most peculiarly appropriate to the treaty of 1819, and will now be noticed.

Sims *vs.* Irvine arose on a compact between Pennsylvania and Virginia, in 1779, which stipulated, "that the private property and rights of all persons, acquired under, founded on, or recognised by the laws of either country, previous to the date hereof, be saved and confirmed to them, although they should be found to fall within the other; and that in the decisions of disputes thereon, preference shall be given to the elder or prior right, whichever of the said states the prior right shall have been acquired under," &c. (3 Dall. 426;) on which the Court laid down these principles: The terms therein of reserve and confirmation " of the rights which had been previously acquired under Virginia, in the territory thereby relinquished to Pennsylvania, must, from the nature of the transaction, be expounded favourably for those rights; and so that titles substantially good, should not, after a change of jurisdiction, be disputed or questioned for formal defects." 3 Dall. 456, 457. The case of Marlatt *vs.* Silk arose under the same compact; in which the Court decided, that a right recognised by Virginia previous to the date of the compact, was secured and confirmed by it, (11 Peters, 21;) and that questions arising under the compact were not to be decided according to the adjudications of either state, but were " of an international character." Ibid. 22, 23.

"In Robinson *vs.* Campbell, the Court construed the compact between Virginia and North Carolina, according to the intention of the parties, as it appeared in the compact, and the laws passed to carry it into effect; and in Burton *vs.* Williams, construed the same compact, and an act of Congress to give it effect, by the events which led thereto, and the motives of the parties to the compact, which influenced them in making it, and gave the utmost latitude to the act of Congress, so as to give effect to the compact, its provisions and objects." 3 Wheat. 218. 220. 533. 535.

Handlin *vs.* Anthony arose on the cession from Virginia to the United States, as to the boundary on the Ohio. The Court decided on it, as it was intended by Virginia when she made the cession; what Virginia had in view in making the deed, according to the great object intended to be effected; and declared that those principles and considerations which produced the boundary, ought to preserve it. 5 Wheat. 377. 379. 383, 384.

Green *vs.* Biddle arose on the compact between Virginia and

2 M 2

Kentucky, the seventh article of which stipulated that all private rights and interests of lands derived from the laws of Virginia, "shall remain valid and secure" under the laws of Kentucky, and "shall be determined" by the laws then existing in Virginia, &c. &c. The Court held, that such rights must be exclusively determined by the law of Virginia, and that their security and validity could not be impaired by a law of Kentucky. That the compact intended to preserve all private rights derived from Virginia, as valid under the laws of Kentucky as they were under the then existing laws of Virginia, so as to preserve the beneficial proprietary interest of the rightful owner in the same state in which they were by the laws of Virginia at the time of the separation; and to use all existing remedies which would prevent those rights from being impaired. 8 Wheat. 13. 16. 89, 90. 92.

The same principles were reaffirmed in Hawkins *vs.* Barney, on the same compact. 5 Peters, 464, 465.

In New Orleans *vs.* The United States, before noticed, the Court, in giving effect to the treaty of 1803, decided directly in contradiction to several acts of Congress, which were unequivocal in their character, asserting the right of the United States to the land in controversy, and granting parts thereof in fee, notwithstanding the admission of the city authorities of the right of the United States, (10 Peters, 735;) thus practically adopting the principles laid down in New Orleans *vs.* De Armas, in 9 Peters, 234—236 ; and deciding according to Spanish law.

In Green *vs.* Biddle it was held, that by the principles of general law, independent of a compact, the titles to real estate can be determined only by the laws of the state under which they were acquired. Every government has, and from the nature of sovereignty must have, the exclusive right of distribution and grants of the public domain within its boundaries, until it yields it up by compact or conquest. The validity of a title can be judged of by no other rule than those laws in which it had its origin; and a title, good by those laws, cannot be disregarded but by a departure from the first principles of justice. "If the article, therefore, meant only to provide for the affirmation of that which is the universal rule in the Courts of civilized nations, professing to be governed by the dictates of law," it was a mere nullity. 8 Wheat. 11, 12. The common law was a part of the law of Virginia; and the claimant of land under Virginia had a right to appear in the Courts of Kentucky as he might in a Virginia Court, if a separation had not taken place; and to demand a trial of his right by the same principles of law which would have governed his case in the Courts of the latter state. Ibid. 74, 75. 83. S. P. 12 Peters, 484. 1 Peters, 542. 544.

In Robinson *vs.* Campbell, the Court decided, that under the compact settling the boundary between Virginia and Tennessee, made in 1802, which contained a clause similar to that in the treaty of Ghent, before recited, "that all claims and titles to land, derived from Virginia, North Carolina, or Tennessee, which have fallen into

[Lessee of Pollard's Heirs *vs.* Kibbe.]

the respective states, shall remain as secure to the owners thereof as if derived from the government within whose lines they have fallen, and shall not be prejudiced or affected in consequence of the establishment of said line." It gave the same effect and validity to the titles acquired in the disputed territory as they had or would have had in the state by which they were granted, leaving the remedies to enforce such rights to be regulated by the lex fori. 3 Wheat. 319, 320, &c.

By the terms of this compact, it appears that they are directly the opposite to the compact of 1820, between Tennessee and Kentucky, for while the latter was an unequivocal admission by Tennessee of the original right of Virginia and Kentucky, it not only omitted any stipulation in favour of grants by Tennessee, it admitted the validity of grants by Virginia, in express terms; whereas, in the former, there was a stipulation in favour of the grants of Tennessee which gave them validity.

These two compacts are as distinctive in their character as the two treaties of 1795 and 1819, between Spain and the United States; and this marked distinction, when carried into the opinions of the Court, in Robinson *vs.* Campbell, and Poole *vs.* Fleeger, on the respective compacts; the cases of Harcourt *vs.* Gaillard, and Henderson *vs.* Poindexter, on the treaties of 1783, and 1795, the cases before recited on the treaties of 1803, 1819, and the several compacts between states, will be found to be clear of all collision with each other, and most conclusive on every point involved in this cause. From 1781 to this time, every treaty of whatever kind, every compact between state and state, states and the United States, articles of capitulation, or even articles of agreement, have been held to effect by their own force, every stipulation which declares, that a thing "shall be" done, or not done ; that thenceforth the thing is done, every thing that "shall not" be done, if done previously, is repealed and nullified.

All treaties, compacts, and articles of agreement in the nature of treaties to which the United States are parties, have ever been held to be the supreme law of the land, executing themselves by their own fiat, having the same effect as an act of Congress, and of equal force with the Constitution; and if any act is required on the part of the United States, it is to be performed by the executive, and not the legislative power, as declared in the case of the Peggy in 1801 ; and since affirmed with the exception of only Foster and Elam. Whether that case, standing solitary and alone, shall stand in its glory or its ruins, a judicial monument, or a warning beacon, is not dependent on my opinion ; my duty is performed by the preceding review of the law of this case in all its various branches, which has led my mind to a conclusion necessarily resulting from the established principles of constitutional, national, and local law.

6. In ascertaining what are judicial principles and rules of decision, in testing the validity of titles, emanating from the Spanish authorities in the disputed territory from 1804 till 1810, under the

treaty of 1803 or 1819; a general reference to the cases before recited will show, that with the single exception of a question of disputed boundary, every other question affecting title has been uniformly held to be strictly judicial. In Hunter vs. Martin, the Court established the general principle, that when a case arises under a treaty, the whole title of the parties must be examined and decided by the Court, as well on the construction of the treaty and every matter bearing upon it. 1 Wheat. 352—360. In New Orleans vs. De Armas, it was decided, that under the Louisiana treaty, the inhabitants had a right to have their titles decided by the same tribunals which decide similar rights in other states. 9 Pet. 235; and in New Orleans vs. The United States, an illustrious instance is found of the action of the Courts of the United States, asserting the supremacy of a treaty, in protecting private property against a series of acts of Congress for nearly thirty years. 10 Peters, 734. 736.

When the true construction of the Florida treaty was settled in the case of Arredondo, the Court declared as a consequence thereof: "The proprietors could bring suits to recover them, (the lands embraced in the grants confirmed by the treaty,) and any question arising would be purely a judicial one." 6 Peters, 741, 742.

So in Percheman's case. "Without it (the eighth article) the titles of individuals would remain as valid under the new government as they were under the old; and those titles, at least so far as they were consummate, might be asserted in the Courts of the United States independently of this article." 7 Peters, 88.

In Delacroix vs. Chamberlain, the question of boundary was considered to be political in its character, but every other question was treated as judicial. 12 Wheat. 600. 602. So boundary was held in Foster and Elam, 2 Peters, 309, to be political. Yet in the same case the Court declared: "Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in Courts of justice, as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provisions." Ibid. 314.

I presume it is scarcely necessary to inquire, whether the construction of an act of Congress presents a judicial or political question.

In Strother vs. Lucas, the Court say, "Treaties are the law of the land, and a rule of decision in all Courts, their stipulations are binding on the United States; in that of 1819, there is a present confirmation of all grants made before January 1818, with the exception of only three which had been previously made, and were expressly omitted." 12 Peters, 439.

In Massachusetts vs. Rhode Island, it was held, that "the construction of compacts between states," was a judicial question, and was so considered by this Court, in Sims vs. Irvine, Marlatt vs. Silk, and Burton vs. Williams." 12 Peters, 725. And after a review of Foster and Elam, Arredondo, and Percheman, it is said,

" That no act of the political department remained to be done; that it (the treaty of 1819) was an executed treaty, the law of the land, and a rule for the Court. In the numerous cases which have arisen since, the treaty has been taken to be an executed one, a rule of title and property; and all questions arising under it to be judicial." Ibid. 747.

The opinion of the Chief Justice in this case, is full to the point now considered. " I do not doubt the power of this Court to hear and determine a controversy between states, or between individuals, in relation to the boundaries of the states, when the suit is brought to try a right of property in the soil, or any other right which is properly the subject of judicial cognisance and decision, and which depends on the true boundary line." Ibid. 752.

But I do not rest this point on judicial authority, a higher power confers inviolable sanctity on the right of the inhabitants, and proprietors of land in the disputed territory, which this Court will never question. The ordinance of 1787 is declared to be a compact between the original states and the people and states in the said territory, and "shall forever remain inviolable, unless by common consent." 1 Laws of the United States, 478. 3 Story, 2076.

" The inhabitants of the said territory shall always be entitled to the benefits of," &c.; " and of judicial proceedings, according to the course of the common law." Ibid. 479.

" No man shall be deprived of his liberty or property, but by the judgment of his peers, or the law of the land;" and if the public emergency requires any person's property to be taken, full compensation shall be made for the same. Ibid.

The sixth article of the Constitution declares, that " all debts contracted, and all engagements entered into, before the adoption of this constitution, shall be as valid against the United States under this Constitution as under the confederation."

Thus this ordinance, the most solemn of all engagements, has become a part of the Constitution, and is valid to protect and forever secure the rights of property and judicial proceedings to the inhabitants of every territory to which it applies.

By the acts of Congress of 1798 and 1800, the ordinance of 1787 was applied to the territory of Mississippi, (1 Story, 494. 778;) in 1805, to the territory of Orleans, (2 Story, 963;) embracing the whole of the disputed territory.

This ordinance, then, is in itself a panoply broad enough to cover every right in controversy in this case, and impenetrable to any assault which can be made upon them by any subordinate power. When this most solemn and mutual compact, this engagement of the old Congress, embodied in the Constitution itself, shall be finally held to be dependent on an act of the new Congress to give it efficiency, there can be no security for property. It must be remembered, too, that in this compact the new states are placed under concomitant obligations to the United States, to purchasers from them,

to non-resident proprietors of lands, and the citizens of the United States, which are worthy of consideration.

"The legislatures of those districts or new states, shall never interfere with the primary disposal of the soil by the United States, in Congress assembled, nor with any regulations Congress may find necessary for securing the title in such soil to the bona fide purchasers. No tax shall be imposed on lands, the property of the United States; and in no case shall non-resident proprietors be taxed higher than those residents. The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free as well to the inhabitants of the said territory as to the citizens of the United States, &c., or those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor." 1 Laws, 479, 480.

Congress cannot expect that this compact will be held sacred by the new states, if the reciprocal engagements of the United States cease to be faithfully performed; and it may be found that the protection and maintenance of the rights of private property in the disputed territory, may conduce more to the honour and interest of the United States than a contrary course, which, in my opinion, will cause " injury to their fame and hazard to their power."

Other considerations arise on a review of the state of things preceding the treaty of 1819, and during the military occupation of this territory by the United States, which deeply concern them in their foreign relations.

In 18—, the minister of Great Britain, in behalf of her ally, called upon this government to explain the reason why the United States had incorporated the territory west of the Perdido into the Union, after it had been declared in the President's proclamation that it was still held by the United States as "a subject of fair, friendly negotiation and adjustment, (3 State Papers, For. Aff. 400,)—a question of sufficient difficulty to answer, when applied to the proclamation alone. But this difficulty would have become the greater, had the confidential message of the President, and the consequent and simultaneous secret resolution and acts of 1811 and 1813 then been publicly disclosed; whereby the law-making, war-making power of the United States, in authorizing the forcible occupation of the territory, by an act of war, had solemnly renewed the pledges of the President, as well in relation to the territorial rights of Spain, as the private property of her grantees.

And if, when this fair and friendly negotiation and adjustment was finally closed by the ratification of the treaty in 1821, the United States had announced to Spain that it did not relate to the territory west of the Perdido; that it belonged to them by the treaty of 1803, and was held solely in virtue thereof; that any cession by the treaty of 1819 was disclaimed, and that the United States disavowed any obligation to confirm any grants of land made by Spain after 1800;

that they remained null and void under the act of 1804, notwithstanding the treaty, till Congress should please to give them validity; that the pledges given by the three departments of the government did not apply to that territory or its private proprietors; that the ordinance of 1789, the Constitution of the United States, the treaty of 1803, or the Constitution of the states to which it was annexed, still left private property dependent on the mere will of Congress. Such declarations would have been met with a new remonstrance, which might have made the United States desirous that its highest judicial tribunal should give to the treaty such a construction as would better comport with the law of nations, the faith of treaties, the injunctions of the Constitution, and those principles which had been the standard rules of federal jurisprudence under the confederation, and thence to the present time.

Whatever the acquisition of the Floridas may have cost, in dollars or acres, it was, as this Court justly remarked, in 3 Peters, 463, richly repaid by its beneficial consequences, "in addition to vacant lands," of which the United States already possessed some hundreds of millions of acres. Nothing can tend so much to their interest, to preserve their high position at home and abroad, as for the United States to consider this treaty to have consummated all the great objects which it was intended to effect; to extinguish the claim of Spain by accepting the cession of the territory, charged with all the titles ceded or recognised under Spain, and in all respects redeeming to their full measure every previous pledge given by any department of its government: whereby, in the words of the first article, "there shall be a firm and inviolable peace, and sincere friendship, between the United States and their citizens and his Catholic Majesty, his successors and subjects, without exception of persons and places;" and in the preamble to the ninth—"with the object of putting an end to all the differences which have existed between them, and of confirming the good understanding which they wish to be forever maintained between them," &c.

Such is the effect of a Treaty of Amity, Settlement, and Limits, by the universally received principles of the law of nations; such, too, is the effect of this treaty, according to the most solemn and often repeated adjudications of this Court; and such would be its effects, if it had been only an ordinary treaty of cession, or compact of boundary, with similar stipulations for the protection of private property.

It requires the application of no new principle, or the liberal expansion of old ones, to take this treaty to so operate, that all land which by the lawfully recognised authorities of Spain in the province had been severed from the royal domain, before January, 1818, was excepted from the cession to the United States by the second and third articles, and that all grants, &c. remain and stand, under the eighth article, ratified and confirmed, as valid to the same extent as they would have been if the territory had remained under the dominion of Spain.

The ground in controversy was so severed in 1809, by a grant or concession, which, though it may not amount to a complete legal title, yet the United States " were bound in good faith by the terms of the treaty," to confirm such concessions, and has admitted its obligation to confirm such as had "been fairly made, as was declared in the first case which arose under the treaty, under a concession for land in the disputed territory, (12 Wheat. 601;) which principle was followed in every subsequent case till 1838, save one; and was fully recognised in Kingsley's case in the clearest terms: " It is admitted, that in the construction of this article (the eighth) of the treaty, the United States succeeds to all the equitable obligations which we are to suppose would have influenced his Catholic Majesty to secure his subjects their property, and which would have been applied by him in the construction of a conditional grant to make it absolute." 12 Peters, 484.

These cases alone are full and decisive authority to rule the present, and when taken in connection with all previous decisions, on treaties and compacts of every description, between the United States and foreign nations, or with the states of this Union, or between state and state, making cessions of territory, or adjusting contested boundaries, from 1781 to 1838, their result, when brought to bear on the treaty of 1819, and the plaintiff's title is decisive.

It has been seen that Foster and Elam is a solitary exception from the uniform course of adjudication for fifty-seven years; that the turning point of that case has been, and is yet admitted to remain and stand overruled, (12 Peters, 519;) and that it can be no authority against the plaintiffs, unless by restoring the overruled construction of the eighth article connected with the ratification, but is conclusive in its favour, when the settled and true construction is infused into that case and the opinion of the Court.

It has also been seen, that the bearing of the decision in Poole vs. Fleeger, on the treaty of 1819, has been entirely misapprehended, by overlooking the obvious and settled distinction between treaties and compacts of cession or boundary, which admit the original right of the nation or state to territory, which had before been possessed by another, without any stipulation for the protection of private property ; and those treaties or compacts which contain no such admission, and do contain such stipulations. That distinction cannot be more strongly marked than will be found on a comparison of the compact of 1820, between Kentucky and Tennessee, and the treaty of 1819 ; and when it is carried into all the cases which have ever been before this Court, it will be most manifest that their decisions have been uniformly influenced and governed by it, except in the one case of Garcia vs. Lee, which admits the application of the treaty to the disputed territory.

If the plaintiffs' case stood alone on this treaty, and it continues to be held to execute its own stipulations, without the aid of a law, it overthrows all intervening obstacles to the confirmation of the grant ; though the land was within the established boundary of

[Lessee of Pollard's Heirs *vs*, Kibbe.]

Louisiana, even admitting that up to 1821 it had remained annulled, under the act of 1804, or any other subsequent law. By the construction now given to that, act, it has no bearing on this case, but independent of this construction, and the conclusive reasons assigned by the Court, other considerations deprive it of all effect; for every subsequent act of Congress, which protects private property, pro tanto repeals it; so does every other act which places the territory, its inhabitants and proprietors, under the government of the Constitution of the United States, or the states which embrace it; and from whatever source the rights of property arise, they are as sacred under the judicial wing of the Union or the state as those of its other citizens.

In addition to this protection, the law of nations, without any treaty, stipulation, or constitutional provision, makes private property inviolable in the cession, relinquishment, conquest, or military occupation of the territory, by some of which means the United States acquired it, and it matters not by which; the laws, usages, and customs of Spain and the province, remained in force as the only rules of title and property, the only test of the validity of grants.

In putting themselves in the place of Spain, whether by her consent or force, the United States took on themselves all the obligations imposed by their position, and the state of the disputed territory under, the treaty of 1803 and subsequent laws, and anew recognised those obligations by the President's proclamation, and the acts of 1811 and 1813; the stipulations of the treaty were only an affirmance and renewal of these obligations, in the more solemn form of a national compact most solemnly ratified; but which bound the United States to nothing to which they were not previously bound, by every guarantee which a government could give to its citizens.

For these reasons, I am clearly of opinion, that without the acts of 1824 or 1836, the plaintiffs' title was as valid as with their aid; those laws only fulfil previous pledges, and I am unwilling to put my opinion on any grounds which may impair their effect, or which leave it open to the inference, that a right of property under this, or any other grant of land west of the Perdido, requires for its confirmation an act which the United States may do or not do, at their pleasure; or that any proprietor, who claims by virtue of such grant, has not the same constitutional rights to judicial proceedings as any other citizen of the United States.

With these settled convictions, arising from a full and often renewed consideration of the course of the executive, legislative, and judicial departments of this government; I must adhere to the opinion thus expressed, till its errors have been made to appear, by a more correct exposition of the law of nations, the obligations of treaties, and the decisions of this Court. I look in vain to the opinion in Foster and Elam, for light on these subjects, there is a profound silence as to the law of nations, or former adjudications; the same silence is observed in Garcia *vs*. Lee, which rests exclusively on Foster and Elam, and Poole *vs*. Fleeger, unless it was intended

to invoke the principles of Arredondo and Percheman, in support of the judgment then given, which were the only other cases referred to in the opinion, and so far from supporting it, are in the most direct hostility to it.

The opinion in Arredondo was delivered after the appeal by the Spanish minister from the decision in Foster and Elam; the opinion in Percheman was an answer to the appeal by the Secretary of State, from some misapprehensions of the opinion in Arredondo. This double appeal was most fully met by the opinion in Percheman, in language which vindicated the honour and interest of the United States, and left this Court no longer exposed to the imputation of being the only department of the government which presented any obstacle to the execution of the treaty as mutually understood.

To these opinions I must adhere, till their principles have been most deliberately reconsidered, and their fallacy exposed; if the laws of nations, as there declared, are not correctly stated, there must be some future adjudication by this Court, defining them with more accuracy, illustrating them with more truth, and more correctly applying their principles to the treaties of 1803 and 1819.

Mr. Justice BARBOUR, dissenting.

I dissent from the opinion just delivered in this case; and will very briefly state the reasons. It is a writ of error to the Supreme Court of Alabama, affirming the judgment of the Circuit Court of Baldwin county of that state, in favour of the defendant in error.

The error alleged is, that the Circuit Court, whose judgment was affirmed by the Supreme Court, misconstrued the act of Congress, entitled " an act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city," passed the 26th May, 1824; in the charge which it gave to the jury, at the trial, as stated in the bill of exceptions in the record.

Before I state the charge, it will be necessary with a view to understand its bearing, to state the material facts appearing in the bill of exceptions to have been proven, and upon which the charge was founded.

Pollard's heirs, at the trial, to maintain the issue on their part, gave in evidence a concession for the lot in question from the Spanish authorities, dated 12th of December, 1809, but which had been reported against, and rejected by the commissioners of the United States, appointed to investigate and report upon such claims; because of the want of improvement and occupancy. They then gave in evidence a patent dated 14th of March, 1837, issued by virtue of an act of Congress, passed the 2d July, 1836, entitled an act for the relief of William Pollard's heirs; the patent embraced the lot in question.

The defendant then gave in evidence, a Spanish grant, dated the 9th of June, 1802, to John Forbes and Company, for a lot of ground, eighty feet front, on Royal street, with a depth of three hundred and four feet to the east, and bounded on the south by Government

street; which grant was recognised and confirmed by an act of Congress.

It was proven that the lot in question is east of Water street, and immediately in front of the lot conveyed by the above-mentioned grant, to John Forbes and Company, and only separated from it by Water street. It was proven, that previously to the year 1819, and until filled up, as hereafter stated, the lot in question was, at ordinary high tide, covered with water, and mainly so, at all stages of the water; that the ordinary high water flowed from the east to about the middle of what is now Water street, between the lot in question, and that embraced in the grant to John Forbes and Company. John Forbes and Company had been in possession of the lot contained in their grant, since the year 1802; and it was known under the Spanish government as a water lot; no lots at that time existing between it and the water.

In the year 1823, no one being in possession, and the lot in question being under water, a certain Curtis Lewis, without any title or claim, took possession of it, and filled it up east of Water street, filling up north of Government street, and at the corner of same and Water street; that Lewis remained a few months in possession, when he was ousted by one of the firm of John Forbes and Company, who erected a smith's shop thereon, and they were then turned out by said Lewis, by legal process, who then retained possession until he conveyed it. When Lewis took possession, Water street at that place could be passed by carts, and was common.

The defendant connected himself, in title, to the lot in question, by means of conveyances, with John Forbes and Company, with Curtis Lewis, and the mayor and aldermen of Mobile. It was admitted that the lot in question lies between Church street, and North Boundary street.

On this state of facts, the Court charged the jury, that if the lot conveyed as above to John Forbes and Company, by the deed aforesaid, was known as a water lot under the Spanish government; and if the lot in question had been improved at and previous to the 26th of May, 1824, and was east of Water street and immediately in front of the lot so conveyed to John Forbes & Company; then the lot in question, passed by the act of Congress of 26th May, 1824, to those at that time owning and occupying, so as above conveyed to John Forbes and Company; and that it was immaterial who made the improvements on the lot on the east side of Water street, being the one in question: that by the aforesaid act of Congress, the proprietor of the lot on the west side of Water street, known as above, that is, as a water lot, under the Spanish government, was entitled to the lot on the east side of it.

Whether this charge was correct or not, depends upon the construction of the act of 1824: and I now proceed to show, that it is, as I think, precisely in accordance with the true construction of that act, nay, that it is almost the very echo of it. The second section provides, "that all the right and claim of the United States to so

many of the lots of ground east of Water street, and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river, and the front of the lots known under the Spanish government as water lots, in the said city of Mobile, whereon improvements have been made, be, and the same are hereby vested in the several proprietors and occupants of each of the lots, heretofore fronting on the river Mobile, except," &c. I will at present pause here, and examine the meaning of this section, independently of the exception; I will afterwards examine the operation of that. Now the questions are, who were the grantees, and what the things granted by this section? And first, who were the grantees? They were the proprietors and occupants of the lots, heretofore fronting on the river Mobile. It appears from the record, that the lots on the western side of Water street, were the lots heretofore fronting on the river Mobile, and that these were known under the Spanish government as water lots.

There were no lots at that time existing between them and the water. The grantees, then contemplated by the act of Congress, were those persons who owned lots known as water lots under the Spanish government; because those were they which heretofore fronted on the river Mobile: and the record, as I have said, fixes their locality on the western side of Water street.

Next let us inquire, what were the things granted? These were the lots east of Water street, and between Church and North Boundary street, now known as water lots, and situated between the channel of the river and the front of the lots, known under the Spanish government as water lots, whereon improvements have been made.

It appears that the lot in question answers this description, as to locality in every particular; that improvements had been made upon it, and that it was in front of the lot owned by John Forbes and Company, which lay on the western side of Water street, and which originally fronted on Mobile river, reaching to it; and was known under the Spanish government as a water lot. If we now apply the charge of the Court to this state of facts, we shall see that it accords with the language of the law, with extraordinary precision. The jury were told, hypothetically, that if the lot conveyed to John Forbes and Company was known as a water lot, under the Spanish government, which hypothesis is proven to be a fact by the record; and if the lot in question had been improved, previously to the 26th of May, 1824, and this fact also clearly appears from the record; and was east of Water street, and immediately in front of the lot of John Forbes and Company, and this fact, too, as clearly appears from the record; then, that the lot in question passed by the act of Congress of May 1824, to those at that time owning and occupying the lot conveyed to John Forbes and Company.

I repeat, that this charge so fully accords with the law, that it may almost be said to be an echo of its language. I have said that

all the facts which were put hypothetically to the jury, were proven by the record; but it was not at all necessary that this should have been done. When we are examining the correctness of a charge given to a jury, that if a given state of facts existed, a particular legal result would follow, we must assume the existence of the facts; because the charge only instructs the jury that such is the law, if the facts exist, of which they are to judge; and if the facts do not exist, then the charge, by its very terms, does not apply.

But the Court told the jury, that it was immaterial by whom the improvements were made. I cannot doubt the correctness of this part of the charge: in this, too, the Court echoed the very language of the act of Congress, "whereon improvements have been made." Now, as the law itself does not say by whom the improvements have been made, but only that they must have been made; if the Court had said, that they must have been made by any particular person, they would have put another condition into the law, and have required what it did not require. It is said, however, that the law could not have contemplated giving to one man the benefit of improvements made by another. If such could even be supposed to be the proper construction, the facts in the record, would meet it; because it appears, that Forbes and Company did make an improvement on the lot in question, as also did Curtis Lewis, under whom the defendant claims. But the law, to my mind, clearly does not contemplate giving the new water lot to a person, because he made improvements on it; if it had so intended, it would have been so said: but its purpose and its plain language is, that where the new water lot is improved, it shall pass to the owner of the old water lot. The policy of this is obvious. The old water lot originally went to the water; the new water lot did not then exist, having since come into existence; the purpose of the statute was to place the owner of the old water lot in his original position, that of still going to the water, which would be effected by giving him the new water lot, without inquiring by whom it was improved.

But it is supposed that the claim of Pollard's heirs comes within the benefit of the exception, in this section, which, so far as it respects this case, is in these words, "Except where the Spanish government has made a new grant or order of survey for the same, during the time at which they had the power to grant the same; in which case, the right and claim of the United States, shall be, and is hereby, vested in the person to whom such grant or order of survey was made, or in his legal representatives."

It will be observed, that this exception only extends to such grants or orders of survey, as were made by the Spanish government when they had power to make the same. The grant from the Spanish government to Pollard, which is supposed to be within the benefit of this exception, bears date in 1809; if at that time the Spanish government had not power to make the grant, then the exception, by its very terms, does not embrace the case.

Now this Court solemnly decided in Foster and Elam *vs.* Neilson, 2 Peters, 254, and again in Garcia *vs.* Lee, 12 Peters, 511, that in 1809, the date of Pollard's grant, the Spanish government had not the power to make grants in the territory of which the lot in question was a part; and that all such as were made after the treaty of St. Ildefonso were void.

Consistently with these decisions, I think, that at the date of Pollard's grant, the Spanish government had not the power to make it; and it follows, that it is not within the benefit of the exception.

Some reliance seemed to be placed upon the proviso to this section, which is in these words: "Provided, that nothing in this act contained, shall be construed to affect the claim or claims, if any such there be, of any individual or individuals, or of any body politic or corporate." Now, it is too clear for argument, that this proviso cannot aid the claim of Pollard's heirs, upon the assumption that they claim under the exception; because the object of the proviso is to guard any possible claim of others against being affected by the grant of Congress; either in the enacting part of the cession, or in the exception. I have not thought it necessary to bring the first section of the act into the argument, because that only gives to the city of Mobile the right and claim of the United States to such lots as were not confirmed to individuals, by that or any former act; and as the second section does confirm the claims to this lot, either, as I think, to the proprietor of the old water lot, in front of which it lies; or, as is argued, to Pollard's heirs, as holding a Spanish grant, nothing passed to the city of Mobile, whichsoever construction shall prevail; and I will add, that if any thing did pass to the city of Mobile, it appears by the record, that their title or claim was vested in the defendant.

Finally, it was argued, that the title of Pollard's heirs was perfected by the act of Congress of July, 1836, which confirmed to them the lot in question by metes and bounds: but the decisive answer to that is, that that act contains a proviso, that it should only operate as a relinquishment, on the part of the United States, of all their right and claim to the lot, and should not interfere with or affect the claim or claims of third persons. Now, if, as I clearly think, the right of the United States had passed by the act of 1824, to the owner of the old water lot, in front of which the one in question lay, then the United States had no right or claim to relinquish by the act of 1836. And the same consequence precisely would follow, if, as the plaintiffs contend, the right of the United States passed to them by virtue of the exception in the act of 1824. So that whatsoever may be the construction of the enacting part of that act, or of the exception, it would equally follow, that there was no claim or title in the United States, which the act of 1836 could operate to convey or relinquish.

For these reasons, I am clearly of opinion that the judgment of the Supreme Court of Alabama is correct, and ought to be affirmed.

[Lessee of Pollard's Heirs *vs.* Kibbe.]

Mr. Justice CATRON, dissenting.

The town of Mobile was first settled and governed by France; and by the treaty of 1763, ceded to Great Britain, and attached to Florida: by the treaty of 1783, Florida was ceded by Great Britain to Spain. Florida proper, previous to the treaty of 1763, extended to the river Perdido, and only included the country east of it; which river was the boundary between France and Spain, from the first settlement of the country up to 1763. 2 Peters, 300. After 1783, and up to 1800, Spain owned Florida and Louisiana; that power then retroceded to France Louisiana to the same extent it had when France owned it; that is, all west of the Perdido; disregarding the fact that Great Britain had attached the country west of the Perdido to Florida, and that for the purposes of government, Spain, after 1783, had continued to recognise and govern as Florida, all the country east of the Mississippi, north of the Iberville, and south of our boundary in the 30° of latitude. But that the country passed to France as far east as the Perdido, by the treaty of St. Ildefonso of 1800, is the established doctrine of this government, and which is fully recognised by this Court. And by the treaty of cession of 1803, the French Republic ceded Louisiana to the United States, in full sovereignty, with "all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices, which are not private property."

Owing to the confusion growing out of the circumstance, that Great Britain, after 1763, had attached the country west of the Perdido to Florida, and Spain had, after 1783, treated and governed it as part of Florida; it was assumed by Spain, that no part of the province passed to France by the treaty of 1800, or to the United States, by the cession of France of 1803. And Spain, for some nine years after the cession, continued to hold and govern the country, and until we took forcible possession of it.

All title to the vacant lots and squares in the town of Mobile, having been vested in France, by the treaty of 1800, and in the United States, by the cession of 1803, no interest in the soil afterwards remained in the king and government of Spain; and all attempts to grant lands by that power were merely void. Such is the settled doctrine of this Court, as holden in Foster and Elam *vs.* Neilson, 2 Peters, and re-affirmed in Garcia *vs.* Lee, 12 Peters. So Congress has uniformly, from 1804, regarded our title, and the assumptions of Spain. 2 Peters, 304.

The rapid growth and extensive commerce of the city of Mobile, in 1824, rendered it expedient that the city should improve its facilities in regard to navigation; the bay in its front being shallow, extensive wharves and other improvements were indispensable. To accommodate the city, Congress passed an act (ch. 415) of that year, vesting in the mayor and aldermen, and their successors, "for the sole use and benefit of the city, forever, the Hospital and Bakehouse lots; and also all the right and claim of the United States to all the lots not sold or confirmed to individuals, either by that act, or

any former act of Congress, and to which no equitable title existed in favour of any individual, under that act, or any former act." The grant to extend to all public lots lying in front of the city, and between high-water mark and the channel of the river, and between Church and North Boundary streets. Such is the first section of the act; and if nothing more was found in it, there can be no doubt the city took the title to the square, a part of which is in controversy; as the only exceptions in favour of outstanding claims are those conferred by acts of Congress.

The plaintiffs' claim is founded on a concession made by the Spanish Governor of Florida, in 1809; and was a permit to William Pollard, to use and occupy, for the purpose of depositing lumber from his sawmill, the space between Forbes and Company's canal and the king's wharf. As the concession made in 1809 was wholly void, it is useless to inquire into its character; or the nature of the title intended to be conferred.

But it is insisted the claim is excepted from the first section of the act of 1824, by the second; which provides, that in case of any lot, &c., where the " Spanish government has made a new grant or order of survey for the same, during the time at which they had the power to grant the same; in which case, the right and claim of the United States shall be, and is hereby, vested in the person to whom such alienation, grant, or order of survey was made; or in his legal representatives."

The concession of 1809 was made in the face of the act of 1804, (ch. 38, sec. 14. 2 Story's Laws, 939,) pronouncing all grants by the Spanish authorities after the cession, void; Spain certainly had no power to make it, and therefore the act of 1824 does not cover the claim. If it had, a title in fee by force of that act would have vested in Pollard's heirs; and the special act of 1836, in their favour, been superfluous. But neither the parties interested, nor Congress, seem to have supposed the title confirmed by the act of 1824.

The statute also provides, that where improvements had been made on the new water lots east of Water street, that then the title should vest in the proprietor of the old water lot opposite, on the west side of said street; and on this provision, the charge of the Court below turned; that Court holding the title to the part of the premises in controversy to have vested in Forbes and Company, because it was improved at the date of the act of 1824; and that it was immaterial by whom the improvement had been made.

That the improvements referred to by the act must have existed on the new and eastern water lots, is, as I think, free from doubt: but that Forbes and Company could acquire a benefit from the improvement made by Lewis is somewhat doubtful: as, however, no critical construction of the act on this point is called for, none has been made. The act of 1824 passed the title to the property covered by the patent issued by virtue of the act of 1836, unless it was excepted from the first act, and this is the only question in the cause : for as the plaintiff must recover by the strength of his own title, it

[Lessee of Pollard's Heirs *vs.* Kibbe.]

is immaterial whether the city of Mobile, or Forbes and Company, took by the act of 1824. The charge of the Court, in substance, held the patent on which the lessors rely to be void. On the admitted facts, I think it clearly was so; and that the reasons for the judgment, if proper on the whole case, are immaterial.

Such is the uniform rule in actions of ejectment, where a charge of an inferior Court is re-examined on a writ of error.

The defendant, however, shows himself clothed with the titles of the city of Mobile, of Forbes and Company, and of Lewis, on which, the Court pronounced him to have the better right; and, for the reasons above stated, I think, correctly.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Alabama, and was argued by counsel. On consideration whereof, it is ordered and adjudged by this Court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, reversed with costs; and that this cause be, and the same is hereby, remanded to the said Supreme Court, that such further proceedings may be had therein as to law and justice may appertain.